JOSEPH WEBSTER, PLAINTIFF IN ERROR, v. HUGH T. REID.

Where a judgment was rendered by the Supreme Court for Iowa Territory and the record certified to this court by the Supreme Court of the State of Iowa, after her admission into the Union, and the subject-matter is within the jurisdiction of this court, it will take jurisdiction over the case.

Where the legislature of the Territory of Iowa directed that suits might be instituted against "the Owners of the Half-breed Lands lying in Lee County," notice thereof being given through the newspapers, and judgments were recovered in suits so instituted, these judgments were nullities.

There was no personal notice to individuals, nor an attachment or other proceeding against the land, until after the judgments.

The law moreover directed that the court should decide without the intervention of a jury to determine matters of fact. This was inconsistent with the Constitution of the United States.

The court below erred in not permitting evidence to be offered to show that the judgments were fraudulent. It erred also in not allowing the defendant to give his title in evidence.

The defendant ought also to have been allowed to give evidence that the judgments had not been obtained in conformity with the law which required certain preliminary steps to be taken.

THIS case was brought up by a writ of error allowed by John F. Kinney, Judge of the Supreme Court of Iowa, on the 10th of November, 1847. The writ was issued, as usual, in the name of the President of the United States, and was addressed, " To the Honorable the Judges of the Supreme Court of the Territory, now State, of Iowa."

It was what was called an action of right brought by Reid against Webster, to recover the possession of 160 acres of land in Lee County, then in the Territory of Iowa. The suit was brought on the 1st of October, 1844.

The facts were these.

On the 4th of August, 1824, the United States made a treaty with the Sac and Fox Indians, by which a tract of country between the Des Moines and Mississippi Rivers was reserved for the use of the Half-breeds belonging to the Sac and Fox Indians. This treaty was ratified on the 18th of January, 1825.

On the 30th of June, 1834, Congress passed the following act (4 Stat. at Large, 740) :—

" Be it enacted, &c., That all the right, title, and interest, which might accrue or revert to the United States, to the reservation of land lying between the rivers Des Moines and Mississippi, which was reserved for the use of the Half-breeds belonging to the Sac and Fox nations, now used by them, or some of them, under a treaty made and concluded between the United States and the Sac and Fox tribes or nations of Indians, at Washington, on the 4th of August, 1824, be, and the same are hereby, relinquished and vested in the said Half-breeds
37 *

of the Sac and Fox tribes or nations of Indians, who, at the passage of this act, are, under the reservation in the said treaty, entitled, by the Indian title to the same, with full power and authority to transfer their portions thereof, by sale, devise, or descent, according to the laws of the State of Missouri."

On the 16th of January, 1838, the territorial legislature of Wisconsin passed an act for the partition of the Half-breed lands, and for other purposes. The preamble to the act was as follows : —

" Whereas, it is expedient in order to the settlement of that tract of land lying between the Mississippi and Des Moines Rivers, commonly called the ' Half-breed lands,' which was reserved for the Half-breeds of the Sac and Fox tribes of Indians, by treaty made at Washington city, between the United States and those tribes, on the 4th of August, 1824, which was released to said Half-breeds, with power to convey their rights, &c., by act of Congress, approved the 30th of June, 1834, that the validity of the titles of the claimants should be determined, and partition of said lands among those having claims should be made, or a sale thereof, for the benefit of such valid claimants; now therefore, Be it enacted," &c.

The act directed that all persons claiming any interest in said lands should file, within one year, with the clerk of the District Court of Lee County, a written notice of their respective claims, &c. Edward Johnston, Thomas S. Wilson, and David Brigham were appointed commissioners to receive testimony concerning the validity of claims, who should be entitled to $ 6 per diem. The act consisted of twenty-four sections, and pointed out the manner in which the commissioners should discharge their duties. Certain persons were also appointed to sell portions of the land in order to pay all necessary expenses.

On the 22d of June, 1838, a supplement was passed, making certain changes, which need not be particularly noticed.

On the 25th of January, 1839, the Council and House of Representatives of the Territory of Iowa passed an act repealing the two preceding acts, and proceeding as follows : —

" Sect. 2. That the several commissioners appointed by and under that act to sit and take testimony, may immediately, or as soon as convenient, commence actions before the District Court of Lee County, for their several accounts against the owners of the said ' Half-breed lands,' and give eight weeks' notice in the Iowa Territorial Gazette to said owners of such suits; and the judge of said District Court, upon the trial of said suits before it at its next term, shall, if said accounts are deemed correct, order judgment for the amount and costs to be

entered up against said owners, and said judgment shall be a lien on said lands, and a right of redemption thereto; said judgment, when entered, shall draw interest at the rate of twelve per cent. per annum.

" Sect. 3. The words ' Owners of the Half-breed Lands lying in Lee County," shall be a sufficient designation and specification of the defendants in said suits.

" Sect. 4. All the expenses necessarily incurred by said commissioners in the discharge of their duties under the above-named acts, shall be included in their accounts.

" Sect. 5. The trial of said suit or suits shall be before the court, and not a jury ; and this act shall receive a liberal construction, such as will carry out the spirit and intention thereof.

" Approved, January 25, 1839."

At the August term, 1839, of the District Court for Lee County, Edward Johnston and David Brigham, two of the commissioners, recovered judgments against the owners of the Half-breed lands, as follows : —

" EDWARD JOHNSTON v. OWNERS OF THE HALF-BREED LANDS, lying in Lee County, I. T. — In Debt.

" Now comes the auditor, appointed by the court to examine, adjust, and allow the account of the plaintiff in the above-entitled cause, to wit, H. T. Reid, Esq., and makes report that he finds the sum of $ 1,290 to be due from said defendants to said plaintiff, which report is accepted by the court. Whereupon, it is ordered by the court, that the plaintiff recover of the defendants the sum of $ 1,290, together with his costs of suit in this behalf expended."

" DAVID BRIGHAM v. THE OWNERS OF THE HALF-BREED LANDS, lying in the County of Lee. — In Debt.

" Now comes the auditor, appointed by the court to examine, adjust, and allow the account of the plaintiff in the above-entitled cause, to wit, Oliver Weld, Esq., and makes report that he finds the sum of $ 818 to be due from the said defendants to said plaintiff; which report is accepted by the court. Whereupon, it is ordered by the court, that the plaintiff recover of the said defendants the sum of $ 818, the amount stated in the auditor's report, and costs in his behalf expended."

On the 26th of November, 1841, executions were issued upon the above two judgments.

On the 1st of December, 1841, the sheriff levied the executions " on the Half-breed tract of land, situated between the Mississippi and Des Moines Rivers, granted by treaty to the

Half-breeds of the Sac and Fox tribes of Indians," and advertised the same for sale on the 1st of January, 1842.

On the 1st of January, 1842, the sheriff sold the land, containing 119,000 acres, more or less, to Hugh T. Reid, for the sum of $ 2,884.66.

On the 2d of January, 1843, William Stotts, sheriff of Lee County, and successor of the sheriff who had made the sale, executed a deed to Reid for the following tract, viz. : —

" All that tract of land lying between the Mississippi and Des Moines Rivers, and south of a line drawn from a point on the Des Moines River, opposite the point where the northern boundary of the State of Missouri strikes the same, to the Mississippi, commonly known as the Half-breed lands lying in Lee County, and containing 119,000 acres, more or less; the said tract of land lying, being, and situate in the county of Lee and Territory of Iowa aforesaid, with all the right, interest, claim, and demand of the said owners of the Half-breed lands lying in Lee County, in, over, and to the same, and every part and parcel thereof; to have and to hold all the above-granted premises and appurtenances thereto belonging, or in any wise appertaining, to the said Hugh T. Reid, his heirs and assigns for ever.

On the 1st of October, 1844, Reid brought a suit against Webster, and filed the following declaration : —

" *Territory of Iowa, Lee County, ss.*

" Hugh T. Reid *v.* Joseph Webster.

" Hugh T. Reid claims against Joseph Webster a tract of land, with the appurtenances, lying in the county aforesaid, and described as follows, to wit, the northeast quarter of section 12, in township 67 north, and range 5 west, containing 160 acres, more or less ; and thereupon the said Hugh T. Reid says that he has right to the immediate possession of said property, and to the ownership thereof in fee simple, and also to damages for its detention, and offers to prove that such is his right.　　　　　　H. T. Reid, *Attorney for himself."*

The defendant put in the following plea : —

" *Territory of Iowa, Lee County, sct.*

" District Court of said County, October Term, 1841.

" Joseph Webster denies the right of Hugh T. Reid to the tract of land, with the appurtenances, and damages for the detention thereof, as set forth in his declaration, or to any part thereof; and hereupon he prays a jury to determine the truth of this plea.

" Miller, Mills, & Cochran, *for Defendant."*

On the 12th of May, 1845, the cause came on for trial, when the verdict of the jury was for the plaintiff.

There were eight bills of exceptions taken in the progress of the trial, which occupied twenty-six pages of the printed record. Into them were incorporated long legislative acts and deeds, of which a summary is given above.

Instead of transcribing these long exceptions, it will be sufficient to state the points involved.

### First Exception.

The plaintiff offered in evidence the two judgments given in favor of Johnston and Brigham.

This was the first evidence offered by the plaintiff to the jury. The defendant objected to the admissibility of the judgments, as being rendered without jurisdiction; but the court overruled the objections, and admitted the records, to which the defendant excepts, and prays the court to sign and seal this his first bill of exceptions, which is done at the time the same was taken on the trial.

CHARLES MASON, *Judge.*

### Second Exception.

The plaintiff offered in evidence the above judgments, the executions issued thereon, the sheriff's return and deed to Reid; then a witness to prove that Webster was in possession of the land mentioned in the declaration, and had been so since the year 1839 or 1840, and that the land was within the Half-breed reservation; and then the various legislative acts.

The defendant then moved the court to enter a nonsuit against the plaintiff, which motion was overruled by the court, to which ruling and decision the defendant excepts and prays, &c. CHARLES MASON, *Judge.*

### Third Exception.

Be it known, that on the trial of this cause, after the plaintiff had closed his evidence, and defendant had moved the court for a nonsuit, as stated in a bill of exceptions numbered two in this cause, the defendant offered to prove to the jury that the judgments, executions, sheriff's sale, and sheriff's deed, constituting the evidence introduced by plaintiff, was all procured by fraud by said plaintiff and others, and that the whole title of plaintiff is based upon fraud and fiction; to the introduction of which evidence the plaintiff objected, and the court sustained the exception, and ruled that such evidence should not be admitted; to which defendant excepts, and prays the court to sign and seal this bill of exceptions.

CHARLES MASON, *Judge.*

*Fourth Exception.*

.The defendant then offered evidence to show the condition of the Half-breeds, and then the following deeds: —

.1837, March 3.   Na-ma-tau-pas, a Half-breed, to John Bond. .
1837, March 20. .John Bond to Theophilus Bullard.
1838, April 7.   Bullard to Webster, the defendant.

The plaintiff objected to the introduction of any of the said deeds, and the court sustained the objection, and ruled that they should be excluded from the jury, to which opinion the defendant excepts, and prays the court to sign and seal this bill of exceptions.

CHARLES MASON, *Judge.*

*Fifth Exception.*

Be it known, that on the trial of this cause the defendant proved that he acquired the possession of the premises described in plaintiff's declaration by a purchase, as set forth in deeds included in defendant's fourth bill of exceptions, in the year 1838; that at the time he purchased there were improvements on said tract, and that he took possession, and has been in possession ever since. The defendant then produced evidence, and offered to prove by parol testimony, that no service had ever been made upon any person in the suits in which the judgments were rendered upon which the sale was made to plaintiff, as set forth in defendant's second bill of exceptions, which bill is referred to here, and made a part of this; that no notice was given by publication of the pendency of said suit; that the plaintiff was the counsel that procured said judgments; that said judgments were rendered upon a fictitious demand, and never proven before the auditor; that Webster and the owners of the Half-breed tract of land, or some of them, were prevented from appearing and defending by the fraudulent representations of said plaintiff; that the sale was in fact never made by the sheriff, Taylor; that the whole return of the sheriff, Taylor, was a fraudulent and false return. The plaintiff objected to the introduction of every part of said testimony, and the court ruled and decided that no part of said evidence was admissible, and ruled that the defendent should not introduce evidence to prove any of the facts above stated; to which ruling and decision the defendant excepts.

CHARLES MASON, *Judge.*

*Sixth Exception.*

Be it known, that on the trial of this cause the defendant filed an affidavit, as follows, to wit: "Joseph Webster, makes oath and says that a certain deed, executed by Hawkins Tay-

lor, sheriff and collector of Lee County, to R. F. Barrett, dated the 27th of September, 1841, and recorded in Lee County, is not in his power to produce on this trial, and is material evidence in his behalf, to be read in the said trial of H. T. Reid *v.* said Webster, as he is advised by his counsel.

"JOSEPH WEBSTER.

"Sworn and subscribed to before me, this 15th of May, 1845.
"J. C. WALKER, *Clerk.*
By J. G. WALKER, *Deputy.*"

After which, offered the recorder's record of Lee County as evidence of the deed mentioned in the affidavit. The plaintiff objected, the court sustained the objection, and ruled that the record of the deed should not be introduced as evidence; to which the defendant excepts and prays, &c.

CHARLES MASON, *Judge.*

### *Seventh Exception.*

The plaintiff offered in evidence the judgments, the execution, and the deed of the sheriff to Reid, the same as mentioned heretofore. The defendant excepted, but the court overruled the objection and admitted the deed, to which ruling the defendant excepts and prays, &c.

CHARLES MASON, *Judge.*

### *Eighth Exception.*

Be it remembered, that, on the trial of this cause, the plaintiff proved nothing in addition to the evidence introduced as set forth in bill of exceptions number two; all the evidence given to the jury by the plaintiff, on examination in chief, or in rebutting evidence, is the evidence contained in defendant's bill of exceptions on the motion to nonsuit plaintiff, and it is here referred to and fully admitted.

Upon this state of facts the defendant prays the court to instruct the jury as follows, to wit:—

1st. That, unless it was proved to the satisfaction of the jury that there was some person or persons within the Territory of Iowa, at the time of the issuing of the process, or appeared at the trial, or at some stage of the proceedings, that were within the jurisdiction of the District Court of Lee County, during the pendency of the suits of Johnston and Brigham, upon which this title accrued, that owned or had an interest in those lands, they must find for the defendant.

2d. That unless they find, from the evidence, that there were owners, and persons or corporations, other than the government, who were owners, or had an interest in said land, at

the commencement of these suits by Johnston and Brigham, they must find for the defendant.

3d. That unless the jury find that some one or more of the owners of the Half-breed tract of land were citizens of the Territory of Iowa at the time of the passage of the act of Iowa legislature, passed January 25th, 1839, or between that time and the time of the execution of the deed by the sheriff to the plaintiff, they must find for the defendant.

4th. That unless it has been proved to the jury that the defendants sued by Johnston and Brigham, and upon whose judgments the plaintiff claims his title, were a corporation by virtue of law, and acting as such, are liable as such, or a partnership firm by that name, or some kind of an association who had assumed the name of Owners of the Half-breed Lands in Lee County, the plaintiff cannot recover.

5th. That if it is not proved to the jury that the judgments of Johnston and Brigham were rendered against some person or persons, body corporate or association of individuals, whose existence has been proved to exist at the commencement of the suit, or at the rendition of the judgments, they must find for the defendant.

6th. That a judgment against a dead person, or a person who has no existence whatever, is no judgment at all in contemplation of law, and a sale under such a judgment is void.

Which said instructions, so prayed for by the defendant, as above stated, to be given severally as stated above to the jury, the court refused to give, and the court refused each and every instruction, severally above prayed for, as mentioned from one to six; to which refusal, and ruling, and decision of the court the defendant excepts, and prays the court to sign and seal this bill of exceptions.

CHARLES MASON, *Judge.*

It has already been stated, that the jury found a verdict for the plaintiff. Webster, the defendant, sued out a writ of error, and carried the case to the Supreme Court.

In January, 1846, the Supreme Court of the Territory of Iowa affirmed the judgment of the court below, when Webster brought the case up to this court.

It was submitted upon printed argument by *Mr. Dixon,* for the plaintiff in error, no counsel appearing for the defendant in error.

*Mr. Dixon,* for plaintiff in error.

We allege that the court below erred, —

1st. In admitting the judgments of Johnston and Brigham,

the executions, the levies, the sheriff's returns and sheriff's deed under them, or either of them, as evidence of title in Reid, the defendant in error; and

2d. In excluding the evidence offered by Webster, the plaintiff in error, to defeat the alleged title of Reid.

And first, in admitting these judgments of Johnston and Brigham, and the proceedings under them, as evidence of title in Reid.

These judgments were rendered under and by virtue of a law of the territorial legislature of Iowa, passed the 25th of January, 1839.

Admitting for the present the entire validity and constitutionality of the above law, yet Reid, in order to avail himself of it, and establish a valid title under it, must show a strict compliance with all its provisions. The affirmative rests with him. It being a statute conferring a special and extraordinary remedy, such a one as is unknown to the common law, no presumption or intendment will be made in favor of a judgment acquired under it, but the party claiming must show that he has conformed to its enactments.

And whether the court rendering these judgments was one of special or of general jurisdiction is immaterial; the legal principle and the reason remain the same. If the remedy is summary and unusual in its character, a compliance with the statute must be affirmatively shown, in whatever court that remedy is sought to be enforced. The court acquires jurisdiction in this case by virtue of the statute alone; without it the court would be powerless; and to justify its action there must be affirmative evidence of a substantial compliance with the requisition of the law from the inception of the suit to its consummation. This principle of law is well established, and but few authorities are necessary to support it. See 3 Phil. & Cowen on Evidence, 946, 987, 988, 989, 1016, and cases there cited; 6 Wheat. 49.

In Massachusetts, it is stated, where a statute gives a new power, and at the same time provides the means of executing it, those who claim the power can execute it in no other way. Andover and Medford Turnpike Co. v. Gould, 6 Mass. 40. See also 14 Mass. 286; 1 Black. 39. And where a summary remedy is given by statute, those who wish to avail themselves of it must be confined strictly to its provisions, and shall take nothing by intendment. Logwood v. Huntsville, Minor, 23; Childress v. McGehee, Ib. 131; Crawford v. State, Ib. 143; Yancy v. Hankins, Ib. 171. And as to the same doctrine, see 1 Mass. 103; 2 Yerg. 486, 493; 10 Wend. 75.

And where a court of general jurisdiction has special au-

thority conferred upon it by statute, it is *quoad hoc* an inferior or limited court.  3 Phil. & Cowen on Evidence, 946, cites 6 Wheat. 119 ; 12 Wend. 9, 11.

In Denning *v.* Corwin, 11 Wend. 647, there was a judgment in partition ; and because it did not appear by the record that the parties were before the court, or shown to the court that the owners were unknown, it was held to be void.  The court in this case was one of general jurisdiction.

In Kentucky the court say that statutes authorizing proceedings against absent defendants and unknown heirs upon constructive notice by publication, must be strictly pursued. Brown *v.* Wood, 6 J. J. Marsh. 11, 14, 29, 30, 193, 197.

In this court the same principles have been fully sustained. Stead's Executors *v.* Course, 4 Cranch, 403.  The principle is laid down, that a collector in the sale of land must act in conformity with the law, and the purchaser is bound to inquire whether he has so acted.

Williams et al. *v.* Peyton's Lessee, 4 Wheat. 77.  It is said that in all cases of a naked power not coupled with an interest, the law requires that every prerequisite to the exercise of that power must precede its exercise; and in the same case, in speaking of publications, the court say, " The purchaser ought to preserve these gazettes, and the proof that these publications were made."

And in Thatcher *v.* Powell, 6 Wheat. 119, the court proceeded to say : " Previous to an order for a sale of land, and subsequent to the report of the sheriff, certain publications are to be made, in the manner and form prescribed by the act. These publications are indispensable preliminaries to the order of sale.  They do not appear to have been made.  The judgment against the land was given at the January term, 1802, on motion, without its appearing, by recital or otherwise, that the requisites of the law in this respect had been complied with, and that the tax still remained unpaid.  We think this ought to have appeared on the record.  The argument is, that the judgment for these errors in the proceedings of the county court may be voidable, but is not void; that until it be reversed, it is capable of supporting those subsequent proceedings which were founded on it.

" We think otherwise.  In summary proceedings, where a court exercises an extraordinary power under a special statute prescribing its course, we think that course ought to be exactly observed, and those facts especially which give jurisdiction ought to appear in order to show that its proceeding are *coram judice*."  See also to same point, Ronkendorff *v.* Taylor's Lessee, 4 Peters, 359.

In Bloom v. Burdick, 1 Hill, (N. Y.) 141, the court say that, " in every form in which the question has arisen, it has been held, that a statute authority by which a man may be deprived of his estate must be strictly pursued." The same doctrine will be found in Rea v. McEachron, 13 Wend. 465; Atkins v. Kinnan, 20 Wend. 241; and in Jackson v. Shepard, 7 Cowen, 88, as cited in 1 Hill, *supra*.

In Jackson v. Esty, 7 Wend. 148, C. J. Savage says: " It is a cardinal principle, that a man shall not be divested of his property but by his own acts, or the operation of law; and where proceedings are instituted to change the title to real estate by operation of law, the requirement of the law under which the proceedings are had must be strictly pursued." And " when laws are to be taken under a statute authority, in derogation of the common law, every requisite of the statute having the semblance of benefit to the owner must be strictly complied with." Sharp v. Johnson, 4 Hill, (N. Y.) 99; Atkins v. Kinnan, 20 Wend. 241.

In the case in 1 Hill, the decision of the court in Denning v. Corwin, 11 Wend. 647, is restricted to the facts before the court. The broad doctrine, that the judgment of a superior court is void if the record do not show jurisdiction, is denied; but it is not denied that the judgment of a superior court in summary proceedings, where it exercises an extraordinary power under a special statute prescribing its course, is void, if the record do not show jurisdiction. See Foot v. Stevens, 17 Wend. 483, and Hart v. Seixas, 21 Wend. 40.

Can there be a doubt of this being a law giving a special and extraordinary remedy? Does it not conflict with the modes of judicial procedure known to the common law? Let us examine its peculiar provisions for a moment. It is made for the benefit of three persons alone, and none others; it is passed to authorize the collection of accounts accruing by virtue of a law of doubtful constitutionality, without showing any special necessity for legislative interference; it waives all personal service of notice upon the defendants, and substitutes constructive notice by publication; it authorizes suit against a something by the designation of the " Owners of the Half-breed Lands in Lee County," and not against any individual by name; it allows interest upon its judgments at the rate of twelve per cent. per annum, when six per cent. was the established rate. See Laws of Iowa (1839), p. 276. It gives to the commissioners their expenses in addition to their *per diem* allowance, while no expenses were allowed them by the act establishing the commission; it then composedly sets at defiance the Constitution of the United States, and the Ordinance

of 1787, by prohibiting the trial by jury, and in conclusion, with an effrontery only surpassed by its absurdity, requires the court to give to it a "liberal construction."

We think, then, we are correct in pronouncing it a special and extraordinary statute; remarkable for the modest learning and critical sagacity it displays in constitutional and common law jurisprudence; and still more remarkable for the nice sense of justice it manifests to extend exact and even-handed justice to the citizen. Surely the poet was rapt in prophetic vision when he exclaimed, "A little learning is a dangerous thing."

We now contend that it was necessary for Reid, in order to recover under this law, to have shown, —

1st. The existence of a corporation, association, or company, legally constituted, and clothed with authority to sue and be sued by the designation of the "Owners of the Half-breed Lands lying in Lee County."

2d. That such company were the owners of the land in controversy, or that Webster, or some one under whom he claimed, was in fact an associate or member of such company, and bound by its acts.

3d. That eight weeks' notice of such suit was published in the Iowa Territorial Gazette; and

4th. That the trial took place before the Lee County District Court, and not before a jury.

Now it appears from the bills of exceptions, that not one of these things was shown or in proof on the trial of this cause, and that the recovery was had upon the production of the judgments alone.

In this case Reid recovered by virtue of judgments against "Owners of Half-breed Lands," &c. This is not the name of an individual. It is not a name known to the law, except as an incorporation. There ought to have been an averment and proof of the existence of such a corporation. Louisville Railroad Co. v. Letson, 2 Howard, 497. See also Williams v. Bank of Michigan, 7 Wend. 540; Welland Canal Co. v. Hathaway, 8 Wend. 480. In Portsmouth Livery Co. v. Watson, 10 Mass. 91, it is said that the existence of private incorporations, established by the laws of Massachusetts, and that of all corporations established by the laws of other States, must be proved as a fact.

But again, the fact of the defendants being denominated "Owners," &c., did not, *per se*, constitute them owners, nor confer any title to the farm in litigation upon them, notwithstanding it might be situated within the boundaries of the Half-breed tract. It was, therefore, indispensable either to have

shown title in those " Owners," deduced from some common source, or to have connected Webster with the company, by the name of " Owners," &c. Neither was done; and we conceive this to be fatal to Reid's recovery. A special statute, incorporating certain persons for purposes of private advantage or emolument, does not bind (say the courts) any person named therein, unless he consent thereto. Ellis v. Marshall, 2 Mass. 269; Little v. Frost, 3 Ib. 106, 116. And in Beatty v. Lessee of Knowles, 4 Peters, 167, it is decided that a private act of incorporation cannot affect the rights of individuals who do not assent to it; and that in this respect it is considered in the light of a contract, is a position too clear to admit of controversy. How, then, are we to be bound, or our rights affected, by a judgment against a company, the existence of which is not proved, in whom no title is shown, and as to whom we are strangers?

We were in possession of the property, and had been in possession for several years, and possession is *primâ facie* evidence of title and ownership. Adams on Eject. 32 and notes; Ib. 319, note 2; Jackson v. Hillsborough, 1 Dev. & Batt. 177. And the law will never construe a possession tortuous, except from necessity; but will consider every possession lawful, the commencement and continuance of which are not proved to be wrongful. 5 Cond. R. 242. Such being the presumption of law, what evidence is introduced by Reid to destroy that presumption? The " Owners," &c. are not proved ever to have been in possession, nor ever to have held or claimed any title. What semblance of right or virtue, then, is there in these judgments, unaided by other proof, that we should be dispossessed of our property, and deprived of our home. We humbly conceive there is none. We have no connection with these assumed " Owners," &c. We claim by distinct title; and unless Reid shows their legal existence, and title in them, from some common source, or connects us with them, he cannot recover from us, or affect our interests.

It was also necessary for Reid to have shown on the trial, that there was eight weeks' notice of the commencement of these suits published in the Iowa Territorial Gazette, previously to the entry of the judgments. This is a distinct and substantive requirement of the law. Without such published notice, the court had no power to render judgment. It was indispensable to jurisdiction. It is not pretended that any such proof was offered, and can it be said that this was not indispensable? Here the law dispenses with all personal service; no human being, no legal body, is required to be notified according to the mode pointed out by the common law, by rea-

38*

son, and by common justice. Constructive notice is substituted. A mere publication for a short period of time, addressed to an unknown body, is declared to be sufficient. Can it be that it is not necessary to prove this publication, as preliminary to the introduction of the judgments in evidence? Is the principle, consecrated by the venerable system of the common law, and incorporated into our constitutions, that no person shall be deprived of his property unless by due process of law, to be thus trifled with and frittered away? This court has always appreciated and held sacred this right of the citizen to due notice of judicial proceedings against him; and it affords us pleasure to quote its bold and eloquent language. In Shriver's Lessee v. Lynn et al., 2 Howard, 60, the court say, "No court, however great may be its dignity, can arrogate to itself the power of disposing of real estate without the forms of law. It must obtain jurisdiction of the thing in a legal mode. A decree without notice would be treated as a nullity."

And whenever original jurisdiction is exercised, "It is admitted that the service of process or notice is necessary to enable a court to exercise jurisdiction in a case; and if jurisdiction be taken where there has been no service of process or notice, the proceeding is a nullity. It is not only voidable, but it is absolutely void." Lessee of Walden v. Craig's Heirs et al., 14 Peters, 154.

In Hollingsworth v. Barbour et al., 4 Peters, 475, the court say, "It is an acknowledged general principle, that judgments and decrees are binding only upon parties and privies. The reason of the rule is founded in the immutable principles of natural justice, that no man's rights should be prejudiced by the judgment or decree of a court, without an opportunity of defending the right."

Now what opportunity does it appear that we have had to defend our right? None whatever.

There are many decisions showing the necessity of publication, and proof thereof, in order to confer jurisdiction.

In Denning v. Corwin, 11 Wend. 647, above cited, the court state, that the New York statute of partition gives the court no jurisdiction to take any step against unknown owners until notice has been published according to the statute, and this must appear by the record.

It is not sufficient that an order of publication is had in a chancery cause; proof of the publication must also be made. 4 Equity Dig. 488, § 20, cites 4 Stew. & Port. 84.

If a decree be taken by publication against an absent defendant, the statements in the bill are not evidence in any collateral contest. 3 Equity Dig. 389, § 2.

A printer's certificate of publication of an order against non-residents must be copied in the record. A statement that it was filed is insufficient to show that the defendant has proper notice. 3 Equity Dig. 525, § 2, cites 3 J. J. Marsh. 105.

A recital in a decree of the publication of the order against an absent defendant does not prove it, but the evidence must be filed. 3 Equity Dig. 552, § 3; 4 Monroe, 544.

And in 1 McLean, 321, it is decided that facts must be stated to enable the court to judge. A statement by the auditor, that land was legally advertised and sold, cannot be received as evidence; facts must be stated. In Parker *v.* Rule's Lessee, 9 Cranch, 64, cited in 4 Cond. R. 397, a sale was declared to be invalid because it did not appear in evidence that the publications required by the ninth section of the act had been made; the court inferred that they had not been made, and considered the case as if proof of the negative had been given by the plaintiff in ejectment. The same point was decided in 4 Cond. R. 397.

Other decisions might be introduced, but the above abundantly establish the doctrine for which we contend: that the defendant must have the notice required by law; and when the statute prescribes a kind of notice differing from the common law mode, a compliance with such statute must be affirmatively shown. If the publication pointed out by law was necessary to jurisdiction, and the court cannot presume the fact of publication unless from proof, then the omission of such proof on the trial by Reid is equivalent, as far as we are interested, to an established want of jurisdiction in the court pronouncing these judgments. Jurisdiction is defined to be the power to hear and determine; this power can only be brought into exercise by publication; there is no evidence of publication in this case, and as it cannot be presumed, the consequence is obvious, that these judgments were void acts, without validity, and incapable of conferring powers or rights. For wherever a court acts without jurisdiction, its decrees, judgments, and proceedings are absolute nullities, powerless as evidence for any purpose whatever. "They are not voidable, but simply void, and form no bar to a recovery sought, even prior to a reversal in opposition to them. They constitute no justification; and all persons concerned in executing such judgments or sentences are considered in law trespassers. This distinction runs through all the cases on the subject, and it proves that the jurisdiction of any court exercising authority over a subject may be inquired into in every other court where the proceedings of the former are relied on, and brought before the latter by the party claiming the benefit of such proceed-

ings." Elliott et al. v. Peirsol et al., 1 Peters, 340. See also 5 Cond. R. 758; 2 McLean, 477; 13 Peters, 511; and especially, Lessee of Hickey et al. v. Stewart et al., 3 Howard, 762, where the whole doctrine is well laid down.

The judgments ought not to have been admitted in evidence on the trial in this cause, for the further reason, that upon their face they appear to have been respectively founded upon the report of an auditor appointed by the court, which report the court merely confirmed. The examination of witnesses and vouchers, and the ascertainment of the amount of indebtedness, were all performed by the auditor, and not by the court. The auditor does not return the facts and evidence upon which his report is based, and from which his conclusions are drawn, so that the court might exercise a judicial judgment over it, but he simply specifies the amount he finds to be due, and upon which finding and statement the court enters up judgment. Now the law requires the trial to take place before the court. It gives no power of substitution to the judge. It nowhere speaks of an auditor or any other auxiliary officer acting in the matter. It conferred power upon the judge alone; and it is well settled, that judicial power cannot be delegated unless expressly authorized by law. The legislature enacting this law demonstrate their unbounded confidence in the judge by abolishing the trial by jury, and at the same time clothing him with magisterial authority over the whole matter in the nature of a personal and judicial trust. The recitals in the judgments themselves show that he did not exercise any judgment in the matter. How could he have done so, when he placed his judgment and his conscience in the keeping of another? To say the least, there was a great want of ordinary prudence and circumspection on the part of the court, if there was not a palpable and inexcusable violation of duty. It is enough that we are deprived of a jury, without also being deprived of a judge, in pronouncing these judgments which are now brought forward under color of law to filch from us the hard earnings of years of toil. For all practical purposes, the auditor, and not the court, pronounced these judgments.

The above reasoning is predicated of the supposition, that the act under which those judgments were rendered was a valid and constitutional law. This we deny. We feel confident in affirming that the act never had a valid existence. A legal judgment never could be recovered under it. Having no power, it could confer no power. No judicial tribunal could confirm or transmit any rights through its instrumentality. It was utterly powerless for any valid purpose whatever. And our reasons are —

1st. It was made in subversion of principles of common right, and therefore void. It attempts to do away with the necessity of personal service of process in the commencement of actions. This, as we have shown, would endanger the safety of persons and property. It aims to give to three per-. sons extraordinary and additional privileges and remedies in the collection of their debts, which are not given or extended to others. It is thus exclusive, operates partially, and is against common right. It directly gives to them a rate of interest upon their judgments double what the laws of Iowa give to any other citizen. No reason is assigned, and no necessity shown to exist, for awarding such a preference; and this is also against common right. Now the cases say that statutes passed against the plain and obvious principles of common right and common reason are null and void, so far as they are calculated to operate against these principles. Ham v. Mac-Claws, 1 Bay, 93, and see Morrison v. Barksdale, Harper, 101.

2d. It is in violation of the Constitution of the United States, of the Ordinance of 1787, and of the organic law of 1838, establishing the territorial government of Iowa.

The Constitution of the United States guaranties the right of trial by jury. Amendment to Constitution, Article 7.

The Ordinance of 1787, organizing the Northwestern Territory, art. 2, secures to its inhabitants the trial by jury, that all judicial proceedings shall be according to the course of the common law, and that no man shall be deprived of his property but by the judgment of his peers, or the law of the land. And the organic law of 1838, sect. 12, extends to the inhabitants of Iowa the rights, privileges, and immunities previously granted and secured to the inhabitants of Wisconsin, and of course includes the above provisions in the Ordinance of 1787.

The fifth section of the law in question provides, " that the trial of said suit, or suits, shall be before the court, and not a jury."

Now, it would appear to be sufficient, to place these constitutional and organic restrictions upon the territorial legislature in juxtaposition with the above legislative provision, in order to demonstrate their absolutely irreconcilable character. The statement itself would seem to involve an inconsistency so glaring, that all reasoning upon it would be superfluous. But as it is a constitutional inquiry, involving the validity of legislative enactment, and in its determination affecting deeply the interests and rights of the citizen, it may not be improper to examine briefly the laws and the authorities on the subject;

for whatever jeopardizes for a moment the integrity of the trial by jury ought to be strictly scrutinized and condemned.

" The impartial administration of justice," says an eminent jurist, " which secures both our persons and our properties, is the great end of civil society ; and it is the most transcendent privilege which any subject can enjoy, or wish for, that he cannot be affected either in his property, his liberty, or his person, but by the unanimous consent of twelve of his neighbors and equals." This was written nearly a century ago, and is equally true now as then. The right is as sacredly cherished and vigilantly guarded as ever. " It is enthroned in the hearts of the people, it is enshrined in the sanctuary of the Constitution, and as well might the frantic suicide hope that the act which destroys his miserable body should extinguish his eternal soul," as any individual or body of men expect with impunity to attack or overthrow this glory of the law and invaluable privilege of the citizen. See Parsons *v.* Bedford, 3 Peters, 446.

We suppose it will not be controverted, that territorial legislatures are restricted in the exercise of legislative power to such as is expressly given them by the law of Congress organizing the territorial government. That law constitutes their charter ; under it they act, and by virtue of it alone are their acts valid. Judge Story says : " As the general government possesses the right to acquire territory, either by conquest or by treaty, it would seem to follow, as an inevitable consequence, that it possesses the power to govern what it has so acquired. The territory does not, when so acquired, become entitled to self-government, and is not subject to the jurisdiction of any State. It must consequently be under the dominion and jurisdiction of the Union, or it would be without any government at all." 3 Story on Const. 193, 194 ; American Ins. Co. *v.* Canter, 1 Peters, 511.

And again : " What shall be the form of government established in the territories depends exclusively upon the discretion of Congress. Having a right to erect a territorial government, they may confer on it such powers, legislative, judicial, and executive, as they deem best." See 3 Story on Const. 195.

Territories are, then, nothing but political corporations, exercising such powers alone as are conferred by the charter of incorporation, or act organizing them. We examine this charter or act, and find that the Ordinance of 1787 is adopted as a part of it ; and in that Ordinance are contained the restrictive enactments above enumerated. We suppose, also, that in the construction of these provisions we must refer to the expositions and decisions of the common law, wherein these provisions

have received an appropriate and determinate signification.
When we adopt the common law, or portions of it, we also
adopt the established adjudications upon them.   It may be
true that the common law of England is not, in all respects, to
be received as the law of America.   This court has said, " Our
ancestors brought with them its general principles, and claimed
it as their birthright; but they brought with them and adopted
only that portion which was applicable to their situation."
Van Ness *v.* Packard, 2 Peters, 144.

The words "trial by jury" and "judgment of his peers"
would seem to be nearly equivalent in meaning.   A trial by a
jury is "a trial by twelve of the party's peers"; and the judg-
ment of his peers means, "trial by a jury of twelve men, ac-
cording to the course of the common law."   2 Kent's Com.
12, 13, note b.

The clause "law of the land" signifies, that statutes which
would deprive a citizen of the rights of person or property
without a regular trial, according to the course and usage of
the common law, would not be the law of the land in the
sense of the ordinance.   See Hoke *v.* Henderson, 4 Dev. (N.
C.) 15.

In Taylor *v.* Porter, 4 Hill (N. Y.), we have the same doc-
trine.   " The words ' by the law of the land,' " say the court,
" do not mean a statute passed for the purpose of working the
wrong.   That construction would render the restriction abso-
lutely nugatory, and turn this part of the Constitution into
mere nonsense."

" By the law of the land," says Lord Coke (2 Inst. 45 – 50),
" is meant ' by the due course and process of law.' "   It does
not mean a mere act of the legislature, for such a construc-
tion would remove all limitation on legislative authority, and
destroy the restrictive power of the above constitutional pro-
visions.   As originally used in Magna Charta, ch. 29, it was
understood to mean due process of law.   See 2 Kent's Com.
13, note b, and In the Matter of John and Cherry Streets, 19
Wend. 659.   And Justice Story says, the clause "by law of the
land " meaneth due process of law, and which in effect affirms
the right of trial according to the process and proceeding of
the common law.   3 Story on Const. 661.   See also 1 Tuck-
er's Black. Com., App. 304, 305.

The words, " of judicial proceedings according to the course
of the common law," would appear to be, not only in affirma-
tion of the security afforded by the provision " the law of the
land," but in extension of it to all judicial proceedings in the
progress of litigation, and which are known to the common law.

The words " common law," as used in the Constitution,

have received a judicial interpretation. The phrase "is used in contradistinction to equity, and admiralty, and maritime jurisprudence. It means not merely suits which the common law recognized among its old and settled proceedings, but suits in which legal rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized and equitable remedies were administered; or where, as in the admiralty, a mixture of public law, and maritime law, and equity, was often found in the same suit." "In a just sense" (the seventh amendment of the Constitution) "the amendment then may well be construed to embrace all suits which are not of equity and admiralty jurisdiction, whatever may be the peculiar form which they may assume to settle legal rights." Parsons *v.* Bedford, 3 Peters, 446, 447.

(The counsel then proceeded to argue that this statute was against the organic law of Iowa, and the second article of the Ordinance of 1787; and that if the law was void, the judgments under it were equally so. He then argued that jurisdiction over this Indian reservation remained in Congress, which had never transferred it to the Territory; that the defendant below had a right to show an outstanding title, and also to show fraud in the original judgments and subsequent proceedings therein. The reporter has already allotted a large space to the argument, and regrets that he cannot insert the views of the counsel upon these points.)

Mr. Justice McLEAN delivered the opinion of the court.

This case is brought here by a writ of error to the Supreme Court of Iowa.

A judgment was obtained by the defendant, Reid, against the plaintiff in error, Webster, at May term, 1845, in the District Court of Lee County, Iowa Territory, for the recovery of a quarter-section of land; which judgment was removed by writ of error to the Supreme Court of the Territory; and afterwards, at January term, 1846, the judgment of the District Court was affirmed.

On the 3d of March, 1845, an act was passed by Congress, to admit the State of Iowa into the Union. By the fifth section of that act, it was made a fundamental condition to the admission of the State, that certain provisions of the act should be "assented to by a majority of the qualified electors at their township elections," on which the President was required, by proclamation, to announce the admission of the State into the Union.

The judgment in this case was rendered by the territorial court, before the State of Iowa had been admitted. The writ

of error from that court was directed to the Supreme Court of the Territory, and the record has been certified in obedience to it by the Supreme Court of the State, where, it seems, the records of the territorial Supreme Court are deposited.

As this proceeding was commenced and consummated in the territorial courts, over which this court can properly exercise a revisory jurisdiction, the District Court of the United States would have been a more appropriate deposit for the record. But, under the circumstances, this is not considered material to a revision of the proceedings, no mandate being required to give effect to the judgment of this court.

The subject-matter being clearly within our jurisdiction, and having possession of the record, we see no objection to an examination of the case. This court held in Gelston *v*. Hoyt, 3 Wheat. 246, under the twenty-fifth section of the Judiciary Act of 1789, giving appellate jurisdiction to this court from the final judgment of the highest State court, "the writ of error may be directed to any court in which the record and judgment on which it is to act may be found, and if the record has been remitted by the highest court and to another court of the State, it may be brought by the writ of error from that court." In principle, that case is analogous to the one under consideration. If the record contain the judgment duly certified, over which we can exercise jurisdiction, it is not essential that it should be certified by the court rendering the judgment.

The questions in the case arise on exceptions taken to the rulings of the court at the trial.

To sustain the plaintiff's title, two judgments and executions thereon, with the sheriff's return, were offered in evidence. The first in behalf of Edward Johnston *v*. " The Owners of Half-breed Lands lying in Lee County," Iowa Territory, for twelve hundred and ninety dollars, at August term, 1839; the other in behalf of David Brigham *v*. the same defendants, for the sum of eight hundred and eighteen dollars, at the same term. Executions having been issued on these judgments, the sheriff returned on both of them that he had levied " on the Half-breed Sac and Fox reservation in Lee County, Iowa Territory, commonly called the Half-breed tract"; and had advertised and sold the same for the sum of twenty-eight hundred and eighty-four dollars, sixty-six cents.

In pursuance of this sale, the sheriff made to Hugh T. Reid, the purchaser, a deed for the lands levied on, containing one hundred and nineteen thousand acres, more or less.

The above proceeding took place under a law of the territorial legislature of Iowa, passed the 25th of January, 1839. By the first section of that law, " An Act for the partition of the

Half-breed lands, and for other purposes," and an act supplementary thereto, were repealed. The preamble to the repealed act expresses its object, — " Whereas it is expedient, in order to the settlement of that tract of land lying between the Mississippi and Des Moines Rivers, commonly called the Half-breed lands, which was reserved for the Half-breeds of the Sac and Fox tribes of Indians, by treaty made at Washington city, between the United States and those tribes, on the 4th of August, 1824, which was released to said Half-breeds, with power to convey their rights, &c., by act of Congress, approved the 30th of June, 1834, that the validity of the titles of the complainants should be determined, and partition of said lands among those having claims should be made, or a sale thereof for the benefit of such valid claimants."

The second section of the repealing act provided, that the several commissioners by and under the act repealed, who were authorized to sit and take testimony, &c. under said act, " may immediately, or as soon as convenient, commence actions before the District Court of Lee County, for their several accounts against the owners of the said ' Half-breed lands '; and give eight weeks' notice in the Iowa Territorial Gazette to said owners of such lands; and the judge of said District Court, upon the trial of said suits before it at its next term, shall, if said accounts are deemed correct, order judgment for the amount and costs to be entered up against said owners, and said judgment shall be a lien on said lands," &c.

The third section declares, " The words 'Owners of the Half-breed Lands lying in Lee County,' shall be a sufficient designation and specification of the defendants in said suits."

By the fifth section it was provided, that " the trial of said suits shall be before the court, and not a jury; and this act shall receive a liberal construction, such as will carry out the spirit and intention thereof."

The deed from the sheriff to Reid, and also the judgment and executions on which it was founded, having been given in evidence, though objected to by Webster, he offered to prove to the jury that the judgments, executions, sheriff's sale, and sheriff's deed were all procured by fraud of the plaintiff, and others, and that the whole title of the plaintiff was founded upon fraud and fiction; to which the plaintiff objected, and the court refused to admit the evidence.

The defendant then offered evidence conducing to prove, that Na-ma-tau-pas, under whom he claimed the land, was a Half-breed of the Sac Indians, accompanied by a deed from him for the premises in controversy, to John Bond, dated the 3d of March, 1837; and also a deed from Bond to Theophilus Bul-

lard for the same land, dated the 20th of March in the same year; and also a deed from Bullard to Webster for the same land, dated the 7th of April, 1838; all of which deeds were duly acknowledged; but the plaintiff objected to said deeds being admitted as evidence, and the court sustained the objection.

The defendant then offered to prove that he entered into the possession of the premises, which were improved, and that he had occupied them up to the time of the trial. And he then offered to prove by parol testimony, that no service had ever been made upon any person in the suits in which the judgments were rendered, under which the sale was made; that no notice was given by publication of the institution of said suits; that the plaintiff was the counsel that procured said judgments; that said judgments were rendered upon a fictitious demand, never proved before the auditor; that Webster and the owners of the Half-breed tract of land, or some of them, were prevented from appearing and defending by the fraudulent representations of said plaintiff; that the sale was in fact never made by the sheriff, Taylor; that his returns were fraudulent and false; which evidence, being objected to, was overruled by the court.

Other exceptions were taken, but it is deemed unnecessary to refer to them.

This was an extraordinary procedure from its commencement. With the view to produce a settlement of the large tract of land owned by the Half-breed Indians in the county of Lee, to settle the claims to those lands, partition them among the claimants, or make a sale thereof for the benefit of such claimants, the act of the 16th of January, 1838, containing twenty-four sections, was passed. Thomas S. Wilson, David Brigham, and Edward Johnston were appointed commissioners, who were vested with certain powers to carry out the objects of the act, and who were to receive each six dollars per day for their services. The judgments on which the land was sold were obtained by two of the commissioners, for services rendered under the above act. To satisfy these two claims, the entire tract of the Half-breeds was sold, containing 119,000 acres.

By the act under which the suits were instituted, no other designation of the defendants was required than " Owners of the Half-breed Lands lying in Lee County." These suits were not a proceeding *in rem* against the land, but were *in personam* against the owners of it. Whether they all resided within the Territory or not does not appear, nor is it a matter of any importance. No person is required to answer in a suit on

whom process has not been served, or whose property has not been attached. In this case there was no personal notice, nor an attachment or other proceeding against the land, until after the judgments. The judgments, therefore, are nullities, and did not authorize the executions on which the land was sold.

By the seventh article of the amendments of the Constitution it is declared, " In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved." The organic law of the Territory of Iowa, by express provision and by reference, extended the laws of the United States, including the Ordinance of 1787, over the Territory, so far as they are applicable.

The act under which the above proceeding was had prohibited the trial by jury in matters of fact on which the suits were founded. In this respect the act was void.

The District Court erred in overruling the evidence offered by the defendant, to prove fraud in the judgments, executions, sheriff's sale, and sheriff's deed.

When a judgment is brought collaterally before the court as evidence, it may be shown to be void upon its face by a want of notice to the person against whom judgment was entered, or for fraud.

The District Court also erred in overruling the evidence of title offered by the defendant. The deeds upon their face appeared to have been duly executed; and there was no suggestion that they did not relate to the land in controversy. If no partition had been made, so that Na-ma-tau-pas could not give an exclusive title to the land, yet, being proved to be a Half-breed, he had the power to convey at least his interest in the land, which gave a right of possession to some extent to Webster. The deeds showed that he was not a trespasser, and had a right to defend his possession. The extent of his right of possession under his deed it is not necessary now to determine.

There was also error in the District Court, in overruling the evidence offered by the defendant to show that no notice was given by publication, as the act requires. If jurisdiction could be exercised under the act, it was essential to show that all its requisites had been substantially observed. It was necessary for the plaintiff to prove notice, and negative proof that the notice was not given, under such circumstances, could not be rejected.

For the above reasons, the judgment of the Supreme Court of the Territory, affirming the judgment of the District Court, is reversed.

*Order.*

This cause came on to be heard on the transcript of the record from the Supreme Court of the Territory, now State, of Iowa, and was argued by counsel. On consideration whereof, it is now here ordered and adjudged by this court, that the judgment of the said Supreme Court in this cause be, and the same is hereby, reversed, with costs, and that a statement of this decision be certified to the Supreme Court of Iowa.