435 S.E.2d 664

Steven G. CLARK, Plaintiff Below,

v.

Robert A. ROCKWELL, Jeanette R. Imler and Randolph Imler, Defendants Below.

No. 21613.

Supreme Court of Appeals of West Virginia.

Submitted May 11, 1993.

Decided June 11, 1993.

Jeffrey T. Jones, Hunt, Lee, Farrell & Kessler, Charleston, for appellant.

William Richard McCune, Jr., Tammy Mitchell Bittorf, Jackson & Kelly, Charleston, for appellees.

PER CURIAM:

In these certified questions, we are asked to consider whether a judgment of the Circuit Court of Allegheny County, Maryland, is so contrary to our public policy that we should not enforce it in a suit pending in the Circuit Court of Hampshire County.

The underlying facts are not in dispute. The plaintiff, Steven G. Clark, was injured in an automobile accident in Hampshire County on March 10, 1989. He was a passenger in a vehicle owned by Jeanette and Randolph Imler and driven by Robert A. Rockwell. The Imler vehicle was insured with a liability policy limit of $50,000, which was paid to the plaintiff. The driver of the Imler vehicle, Mr. Rockwell, had a separate liability policy for $100,000 and it also was paid to the plaintiff.

Mr. Clark's mother had an insurance policy issued by Aetna with an underinsured motorist coverage of $50,000 per person and $100,000 per accident. The Aetna policy was issued in Maryland by a Maryland insurance agent. Mr. Clark, who resided with his mother in Maryland, sought to take advantage of this coverage.

Under Maryland law, there was no underinsured motorist coverage because the liability coverage could be used as an offset to the underinsured motorist coverage. Aetna filed a motion for declaratory judgment in the Circuit Court of Allegheny County in Cumberland, Maryland, asking that the court declare Maryland law to control the underinsured motorist payments.

Shortly thereafter, Mr. Clark filed suit for his personal injuries in the Circuit Court of Hampshire County. The Circuit Court of Allegheny County, Maryland, determined that Maryland law governed the case. A copy of its order to that effect was filed with the Circuit Court of Hampshire County along with a motion to dismiss the plaintiff's suit. The Circuit Court of Hampshire County declined to enforce the Maryland judgment, finding that it was against our public policy. It then certified the issue to this Court.[1]

I.

We address initially Certified Question No. 2 relating to full faith and credit. In our interpretation of the Full Faith and Credit Clause found in Section 1 of Article

---

1. The Circuit Court of Hampshire County certified the following two questions to this Court:

"QUESTION NO. 1
Given the undisputed material facts as herein set forth, should the amount of underinsured motorist coverage payable to a claimant under this insurance contract be governed by the law of the State of Maryland, where the policy was issued and delivered and the insured resides, all as set forth in the Maryland Circuit Court Order of January 9, 1992, or does the law of the State of Maryland, as interpreted by the Order entered by the Maryland Circuit Court, violate the public policy of the State of West

Virginia which would provide underinsured motorist coverage for the Plaintiff?
QUESTION NO. 2
Even if the answer to Question No. 1 is that [the] law of the State of Maryland as interpreted by Order of the Maryland Circuit Court violates West Virginia's public policy, should the Maryland Order nevertheless be accorded full faith and credit in the instant West Virginia proceeding as required by W.Va.Code § 57–1–12?"
The Circuit Court of Hampshire County answered Question No. 1: "The law of the State of Maryland, as interpreted by the Order of the Maryland Circuit Court violates West Virginia

IV of the United States Constitution,[2] we have followed applicable United States Supreme Court cases. In its more recent cases, the Supreme Court rarely attempts to give a full summary of the scope of that clause. The following passage from *Nevada v. Hall*, 440 U.S. 410, 421, 99 S.Ct. 1182, 1188, 59 L.Ed.2d 416, 425 (1979), is a typical expression of the Supreme Court's recent interpretation of that clause: "The Full Faith and Credit Clause does require each State to give effect to official acts of other States. A judgment entered in one State must be respected in another provided that the first

State had jurisdiction over the parties and the subject matter." [3]

■ Our traditional statement on the extent of the Full Faith and Credit Clause is reflected in Syllabus Point 2 of *Gonzalez Perez v. Romney Orchards, Inc.*, 184 W.Va. 20, 399 S.E.2d 50 (1990):

" 'Under Section 1, Article IV of the Constitution of the United States, the judgment or decree of a court of record of another state will be given full faith and credit in the courts of this State, unless it be clearly shown by pleading and proof that the court of such other state was

public policy." The trial court answered Question No. 2 in the negative.

2. Section 1 of Article IV of the United States Constitution provides: "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof." Congress enacted a general statute with regard to full faith and credit authentication of acts of state legislatures, territories, or possessions and judicial proceedings therein. 28 U.S.C. § 1738. A more detailed statute exists as to full faith and credit as to child custody determinations in 28 U.S.C. § 1738A. W.Va.Code, 57–1–12 (1923), contains authentication language for full faith and credit purposes.

3. Perhaps one of the best summaries of the scope of the Full Faith and Credit Clause is found in *Milwaukee County v. M.E. White Co.*, 296 U.S. 268, 275–76, 56 S.Ct. 229, 233, 80 L.Ed. 220, 227 (1935):

"A cause of action on a judgment is different from that upon which the judgment was entered. In a suit upon a money judgment for a civil cause of action the validity of the claim upon which it was founded is not open to inquiry, whatever its genesis. Regardless of the nature of the right which gave rise to it, the judgment is an obligation to pay money in the nature of a debt upon a specialty. Recovery upon it can be resisted only on the grounds that the court which rendered it was without jurisdiction. *Pennoyer v. Neff*, 95 U.S. 714 [5 Otto. 714, 24 L.Ed. 565 (1877)]; *Tilt v. Kelsey*, 207 U.S. 43 [28 S.Ct. 1, 52 L.Ed. 95 (1907)]; or that it has ceased to be obligatory because of payment or other discharge; *Anderson v. Clark*, 70 Ga. 362 [(1883)]; *Haggerty v. Amory*, 7 Allen, 458 [89 Mass. 458 (1863)]; *First Nat. Bank v. Hahn*, 197 Mo.App. 593, 198 S.W. 489 [(1917)]; *Revere Copper Co. v. Dimock*, 90 N.Y. 33 [(1882), *aff'd*, 117 U.S. 559, 6 S.Ct. 855, 29 L.Ed. 994 (1886)]; or that it is a cause

of action for which the state of the forum has not provided a court, *Anglo–American Provision Co. v. Davis Provision Co.*, 191 U.S. 373 [24 S.Ct. 92, 48 L.Ed. 225 (1903)]; *compare Kenney v. Supreme Lodge, L.O.M.*, 252 U.S. 411 [40 S.Ct. 371, 64 L.Ed. 638, 10 A.L.R. 716 (1920)], unless it is compelled to do so by the privileges and immunities clause; *compare Douglas v. New York, N.H. & H.R. Co.*, 279 U.S. 377 [49 S.Ct. 355, 73 L.Ed. 747 (1929)]; *McKnett v. St. Louis & S.F.R. Co.*, 292 U.S. 230 [54 S.Ct. 690, 78 L.Ed. 1227 (1934)], and *Broderick v. Rosner*, 294 U.S. 629 [55 S.Ct. 589, 79 L.Ed. 1100, 100 A.L.R. 1133 (1935)]; or possibly because procured by fraud, *compare Christmas v. Russell*, [72 U.S. 290] 5 Wall. 290 [18 L.Ed. 475 (1866)]; *Maxwell v. Stewart*, [89 U.S. 77] 22 Wall. 77 [22 L.Ed. 564 (1874)]; *Hanley v. Donoghue*, 116 U.S. 1 [6 S.Ct. 242, 29 L.Ed. 535 (1885)]; *Simmons v. Saul*, 138 U.S. 439 [11 S.Ct. 369, 34 L.Ed. 1054 (1891)], *with Webster v. Reid*, [52 U.S. 437] 11 How. 437 [13 L.Ed. 761 (1850)]; *McNitt v. Turner*, [83 U.S. 352] 16 Wall. 352 [21 L.Ed. 341 (1872)]; *Cole v. Cunningham*, 133 U.S. 107 [113, 10 S.Ct. 269, 271, 33 L.Ed. 538, 541 (1890)]."
*See also Laing v. Rigney*, 160 U.S. 531, 542, 16 S.Ct. 366, 368, 40 L.Ed. 525, 528 (1896) *quoting Cornett v. Williamson*, 87 U.S. 226, 249–50, 22 L.Ed. 254, 259 (1873) (" 'The settled rule of law is that jurisdiction having attached in the original case, everything done within the power of that jurisdiction, when collaterally questioned, is to be held conclusive of the rights of the parties, unless impeached by fraud.' "); *Roller v. Murray*, 71 W.Va. 161, 76 S.E. 172 (1912) (Syllabus Point 4: "In an action on a judgment of another state the defendant may not plead that the basis of the action was tainted with fraud. The matter is foreclosed by the judgment." Syllabus Point 5: "Fraud in the procurement of a judgment in another state may be pleaded as a defense to an action in this state based on such judgment, but such plea will be deemed insufficient if its allegations are not distinct and particular.").

without jurisdiction to render the same, or that it was procured through fraud.' Syllabus Point 1, *Johnson v. Huntington Moving & Storage, Inc.*, 160 W.Va. 796, 239 S.E.2d 128 (1977)."

■ More to the point of this case is whether the enforcement of a judgment under the Full Faith and Credit Clause can be precluded in a sister state on the basis that the judgment rests upon law that is contrary to the forum state's public policy. There are some earlier United States Supreme Court cases in which it appears that public policy considerations might be relevant if the public policy differential between the two states is substantial. *See Broderick v. Rosner*, 294 U.S. 629, 55 S.Ct. 589, 79 L.Ed. 1100 (1935); *Milwaukee County v. M.E. White Co.*, 296 U.S. 268, 56 S.Ct. 229, 80 L.Ed. 220 (1935). However, later cases appear to hold that the forum state's public policy cannot override the enforcement of a valid judgment rendered in a sister state. *See, e.g., Morris v. Jones*, 329 U.S. 545, 67 S.Ct. 451, 91 L.Ed. 488 (1947); *Williams v. North Carolina*, 317 U.S. 287, 63 S.Ct. 207, 87 L.Ed. 279 (1942), *citing Christmas v. Russell*, 72 U.S. 290, 5 Wall. 290, 18 L.Ed. 475 (1866); *Riley v. New York Trust Co.*, 315 U.S. 343, 62 S.Ct. 608, 86 L.Ed. 885 (1942); *Titus v. Wallick*, 306 U.S. 282, 59 S.Ct. 557, 83 L.Ed. 653 (1939). *See also Kenney v. Supreme Lodge*, 252 U.S. 411, 40 S.Ct. 371, 64 L.Ed. 638 (1920). We recognized the latter principle in Syllabus Point 5 of *Paull v. Cook*, 135 W.Va. 833, 65 S.E.2d 750 (1951):

"'Under the full faith and credit clause of the federal constitution [United States Constitution, Article IV, Section 1], the courts of this state may not refuse to enforce a judgment of another state because it involves some contravention of the public policy of this state.' Point 4, Syl., *International Harvester Company of America v. Solazo*, 116 W.Va. 34 [178 S.E. 429 (1935)]."

■ Therefore, based on an assumption that the Maryland court's decision on the insurance policy violates our public policy, such judgment still will be entitled to full faith and credit in our courts. Thus, we find the circuit court should have answered the second certified question in the affirmative and granted full faith and credit to the Maryland judgment.

## II.

■ With regard to the first certified question relating to whether our public policy on underinsured motorist coverage is violated by Maryland's limited determination, we are controlled by *Nadler v. Liberty Mutual Fire Insurance Co.*, 188 W.Va. 329, 424 S.E.2d 256 (1992). There, we considered the issue of whether residents of Ohio injured in an automobile accident in West Virginia could have the benefit of our underinsured motorist law based on our public policy even though their insurance policy was issued in Ohio. Their automobile was involved in an accident when a tractor-trailer truck crossed the centerline and struck them on U.S. Route 60 in Greenbrier County. The parties agreed that under Ohio law, where the policy was issued, the underinsured motorist coverage was offset by the amount recovered under applicable liability policies. This same offset exists under Maryland law. The liability payments in *Nadler* exceeded the underinsured coverage limits and, if Ohio law applied, there could be no recovery. The same factual situation exists in this case.

In *Nadler*, we began our analysis of the public policy issue by referring to *Lee v. Saliga*, 179 W.Va. 762, 373 S.E.2d 345 (1988), where we dealt with our conflict of laws rule on interpreting underinsured motorist coverage. In Syllabus Point 2 of *Nadler*, we quoted the conflict of laws rule regarding contracts developed in *Lee v. Saliga, supra:*

"'The provisions of a motor vehicle policy will ordinarily be construed according to the laws of the state where the policy was issued and the risk insured was principally located, unless another state has a more significant relationship to the transaction and the parties.' Syllabus Point 2, *Lee v.*

*Saliga,* 179 W.Va. 762, 373 S.E.2d 345 (1988)." [4]

Although neither *Nadler* nor *Lee* involved the enforcement of a judgment, in *Nadler* we discussed the relevant public policy issue. This issue was whether the uninsured motorist coverage law of another state could be deemed so foreign to our public policy principles that we would refuse to enforce it in a lawsuit brought as a result of an automobile accident occurring in this State.

The foregoing issue is essentially the public policy defense presented in this case. In *Nadler,* we gave the following analysis of our public policy with regard to uninsured and underinsured motorist coverage:

"Our substantive law governing uninsured and underinsured motorist coverages in motor vehicle insurance policies is intended to apply only to insurance transactions which occur in West Virginia or which affect the rights and responsibilities of West Virginia citizens. For this reason, the public policy of full compensation underlying our uninsured/underinsured motorist law is implicated only when the parties and the transaction have a substantial relationship with this state. The importance of the public policy is directly proportional to the significance of that relationship. The more marginal the contact West Virginia has with the parties and the insurance contract, the less reason there is to consider the public policy behind our uninsured/underinsured motorist law as a factor bearing on the choice of law determination." 188 W.Va. at 337, 424 S.E.2d at 264.

We found in *Nadler* that the Ohio plaintiffs were bound by the Ohio law as to the interpretation of their underinsured motorist coverage since most of the substantial contacts

existed in Ohio with regard to their insurance coverage. We pointed out that it was not illogical to assume that a resident of Ohio, where the vehicle is garaged and where the insurance agent is located and the policy issued, might conclude that the Ohio law covered the interpretation of the policy coverage. Certainly, such an assumption would be more logical than the counter-assumption that the policyholder would believe the policy coverage would be determined by the laws of the state where the accident occurred. We, therefore, came to this conclusion in Syllabus Point 3 of *Nadler:*

"The mere fact that the substantive law of another jurisdiction differs from or is less favorable than the law of the forum state does not, by itself, demonstrate that application of the foreign law under recognized conflict of laws principles is contrary to the public policy of the forum state."

Thus, under *Nadler,* there is no conflict between the public policy of our law and that of Maryland. The circuit court should have answered Certified Question No. 1 in the negative by holding that there exists no conflict under *Nadler* between the public policies of our State and Maryland with regard to the enforcement of the underinsured insurance law of a Maryland insurance policy issued to a Maryland resident on a Maryland vehicle.

Having answered the certified questions, this action is dismissed.

Certified questions answered and dismissed.

4. This syllabus point was taken substantially from Section 193 of the Restatement (Second) of Conflict of Laws, which we quoted in note 16 of

*Lee v. Saliga,* 179 W.Va. at 769, 373 S.E.2d at 352, and in note 7 of *Nadler,* 188 W.Va. at 334, 424 S.E.2d at 261.