Christian, J.,
delivered the opinion of the court.
This case is before us upon a writ of error and supersedeas to a judgment of the Corporation court of the city of Alexandria.
The action was ejectment, brought by the defendant in error to recover of the plaintiff in error a house and lot in the said city of Alexandria; and also for damages and mesne profits for its occupation. There was a verdict for the defendant in error for the premises claimed; and the damages for mesne profits and damages for occupation were assessed at the sum of three thousand and eighty-one dollars; and a judgment was entered in accordance with the verdict. There was no motion for a, new trial; and the facts proved are not certified. The legal questions submitted to this court are raised by certain instructions propounded by both plaiutiff and defendant; and the bills of exception taken to rulings of the court, in granting or refusing these instructions, embody the evidence which was before the jury. '
The evidence establishes the following facts : McVeigh was the owner in fee of the premises in controversy, and was in the actual possession of the same until the-day of-, 1861, when he removed to the city of Eichmond, where he remained during the war.
*411 On the 18th day of July, in the year 1863, certain proceedings were commenced by the district attorney of the United States for the Eastern District of for the seizure of said property, for confiscation, under the act of Congress entitled “An act to suppress insurrection, to punish treason and rebellion, to seize and confiscate the property of rebels, and for other purposes.” After a libel of information was filed, and notice thereof published, and before sentence of condemnation was entered by the said District court, McVeigh appeared by counsel, interposed a claim to the property, and filed his answer.
On the 10th March 1864, the attorney of the United States submitted a motion, that the appearance, answer and claim of McVeigh be stricken from the files, for the reason that the respondent “ was a resident of the city of Richmond within the Confederate lines, and a rebel.” And on the same day, the following order was entered: “ And now came on to be heard, the motion of L. H. Chandler, attorney for the United States, libellants herein, to strike from the files the answer, claim and appearance interposed by Messrs. Beach and Bradley for and in behalf of respondent William ÍT. McVeigh; and on motion of L. H. Chandler, the application of libellants is granted, .and it is ordered that the answer and claim interposed in this suit by said Messrs. Beach and Bradley have been irregularly and improperly admitted on file in this cause; and that the same be stricken therefrom.”
On the same day, to wit: on the 10th of March 1864, after the order was entered as above, striking from the files the appearance, answer and claim of the respondent, the court entered its sentence and decree of condemnation of the property libelled; and it was on that same day adjudged and ordered, “ that the real and per *412 sona^ Pr0Perty mentioned and described in the libel in this canse, be and the same accordingly is confiscated 1 and condemned as forfeited to the United States.” And it was on the same day, ordered that a decree of ven^*'ora' exponas be issued by the clerk of the court, to the marshal of the district, directing him to sell the property upon twenty days notice, and make return on the 16th April following.
On the last mentioned day (April 16th, 1864,) which was the return day of the said venditioni exponas, issued under the above order, John Underwood, U. S. Marshal, returned a deed between himself and Maria G. Underderwopd, who is the wife of John C. Underwood, Judge of the District court of the United States for the Eastern District of Virginia, who as Judge of said court entered all the orders above referred to; which deed, after reciting all the proceedings of confiscation above referred to, further recites: “And whereas, after due publication according to law, and the decree of said court, of the time, terms and place of sale, the said property, on the 11th day of Api'il 1864 was sold to the said Mrs. Maria G. Underwood, the party of the second part, she being the highest bidder therefor, for the sum of twenty-eight hundred and fifty dollars: Uow, therefore, the said John Underwood, as Marshal as aforesaid, the party of the first part, in consideration of the premises and of the full payment of the said purchase money, the receipt whereof is hereby acknowledged, doth grant, bargain, sell and convey unto the said Mrs. Maria G. Underwood, the party of. the second part, her heirs, executors, administrators and assigns, the following property, to wit.” And then follows a particular description of the property conveyed by said deed, which is the same property which is the subject of controversy in the case now before this court.
*413 The case was taken tip on a writ of error from the . District court to the Circuit court, where the decree was affirmed, and then carried up to the Supreme court of the United States. The Supreme court pronounced its judgment at the December term 1870, when that court ** ^ reversed the decree of the said District court, and remanded the cause to be proceeded in, in conformity to law. Mr. Justice Swayne, delivering the unanimous opinion of the Supreme court, said: “In our judgment the District court committed a serious error, in ordering the claim and answer of the respondent to be stricken from the files. As we are unanimous in this conclusion, our opinion will be confined to 1 hat subject. The order, in effect, denied the respondent a hearing. It is alleged that he was in the position of an alien enemy; and hence could have no locus standi in that forum. If assailed there, he could defend there. The liability and the right are inseparable. A different result would be a blot upon our j urisprudence and civilization. We cannot hesitate or doubt on the subject. It would be contrary to the first principles of the social compact and of the right administration of justice.” 11 Wall. U. S. R. 267.
It was accordingly ordered and adjudged by the Supreme court of the United States, “that the judgment of the said Circuit court in this cause be, and the same is hereby, reversed and annulled;” and the cause was remanded to the said Circuit court of the United States, for further proceedings to be had therein, in conformity with the opinion of the Supreme court. The mandate of the Supreme court was issued on the 6th of March 1871, and on the 6th of April 1871 the cause came on to be heard in the said Circuit court, and the said libel was dismissed. Thus ended the proceedings in the case of libel for confiscation in United States courts.
Pending these proceedings in confiscation, sundry creditors of McVeigh* (who was a member of a mercan *414 tile firm of the name and style of C. A. Baldwin & Oo. among them Francis Bane & Co., instituted'suit against in the County court of Alexandria county, and attaohed all his interest in the same property which was subject of the confiscation proceedings above referred to. Judgment was rendered against McVeigh in this suit, and an order was made to sell the attached property for the satisfaction of the judgment. On the 10th of May 1864 it was accordingly sold by the sheriff of Alexandria county; and the house and lot now in controversy was conveyed by the sheriff to Maria G-. Underwood, wife of John C. Underwood, who was the purchaser of the same property at the confiscation sale, (the property at the attachment sale having been cried off to one John B. Alley, who assigned his purchase and directed the conveyance to be made to her.)
The sale thus made by the sheriff of Alexandria, in the said attachment suit, was confirmed by the County court on the 6th of July 1864; and the said sheriff was ordered to execute and deliver to the purchaser deeds for the property sold.
On the 6th day of October 1865 the defendants in the attachment suit, McVeigh and Baldwin, appeared, and were permitted to file their petition. Whereupon, it was ordered, “that the same be reopened and docketed, and that they be permitted to make such defence to the judgment and order herein rendered as they might have done before said judgment and order were rendered, on giving security for costs.” And then, by consent of parties, the case was removed to the Circuit court of Alexandria. Upon a case agreed, in lieu of a special verdict, the following order and proceedings were entered and had in that court: “ It appearing to the court that the petitioners, C. A. Baldwin & Co., have not been served with process or a copy of the judgment aforesaid, *415 it is ordered, and adjudged by the court that the judgments complained of be set aside and annulled. But as the purchasers are not before the court, the court declines making any order affecting their rights; reserving, however, to the petitioners, C. A. Baldwin & Co., the right to institute such other and further proceedings as they may be advised necessary to impeach or annul the titles claimed by such purchasers.” The plaintiffs excepted to said order, “ that the judgments complained of be set aside ;” and it being admitted by the defendants that the claims for which the plaintiffs respectively recovered judgment against them, at the January term 1864 of the County court of Alexandria county, were justly due by said defendants to the plaintiffs respectively. The plaintiffs, thereupon, moved the court to confirm said judgments of the County court for the amounts of said claims thereby respectively adjudged to the plaintiffs. But the court denied the motion; and to the ruling of the court, denying the motion, the plaintiff's excepted.
To this judgment of the Circuit court of Alexandria a writ of supersedeas was obtained, which brought the case before the District court of appeals for the fourth Judicial district, held at Fredericksburg. That court, on the 7th day of January 1869, pronounced the following judgment: “This day came the parties, by their counsel; and the court having maturely considered the transcript of the record of the judgment aforesaid, and the arguments of counsel, is of opinion, that the defendant, "William U. McVeigh, had an attachable interest in the estate on which the attachment in this case was levied; and that said attachment was not issued on false suggestions, or without sufficient cause. The court is therefore of opinion, that the said Circuit court erred in overruling the motion of the plaintiffs to confirm the *416 judgment of the County court of Alexandria county, recovered by the plaintiffs agaiiist the defendants, on the 5th of January 1864, and in setting aside and annulling said judgment. But the court is further of opinion, ^iat as t^ie evidence introduced by the said McVeigh, and mentioned in the opinion of the said Circuit court, referred to in the judgment of said court, strongly tends to prove that the purchasers of the propei’ty sold under said attachment were not bona fide purchasers, the defendants are entitled to impeach the title of the said purchasers to the said property, either by a new suit to be instituted for that purpose, or by further proceedings in this cause, at them election. If they elect the former, (a new suit,) then the judgment in this cause should be without prejudice to. their light to relief in any new suit they may be advised to institute. And the cause is remanded to the said Circuit court, for further proceedings to be had therein, according to the principles above declared. ”
The Circuit court, upon receiving the mandate of the District court of appeals, entered a judgment, confirming the judgment of the County court in favor of the claim of the attaching creditors. And thus ended the proceedings in the attachment suits.
Acting under the judgment of the District court, authorizing the defendants to impeach the title of the purchasers of the property sold under the attachment, in a new suit to be instituted for that purpose, McVeigh brought his action of ejectment against John O. Underderwood, for the house and lot purchased by Mrs. Maria G-. Underwood, his wife, and of which they were and still are in possession.
It seems that Underwood and wife executed a deed, conveying this property to one Torce, to be held by him in trust for the sole and separate use 'of the said Maria *417 G-. Underwood; and, upon Ms motion, he was made a party defendant to the action of ejectment. As before stated, there was a verdict and judgment in favor of McVeigh for the premises in controversy, and for a certain amount as damages and mesne profits ; and a writ of error to that judgment brings up the case to this court.
In the petition for a writ of error, there are four assignments of error, which will now be considered seriatim, in the order in which they are propounded:
I. The refusal of the court to grant the defendant’s (plaintiffs in error) first instruction.
II. The refusal of the court to grant the defendant’s (plaintiffs in error) second instruction.
III. The granting of the 1st instruction of the plaintiff, (defendant in error.)
TV. The granting of the second instruction of the plaintiff, (defendant in error.)
V. The admission of the depositions read in evidence by the plaintiff', (defendant in error.)
The first instruction asked for by the plaintiff in error, was in these words: “That the said sentence and decree of condemnation, and the said sale and conveyance of the marshal, divested the plaintiff of his right, title and interest in and to the premises in the declaration mentioned, for and during the natural life of the said plaintiff; and that as to said estate, for and during the natural life of the plaintiff’ in said premises, the jury must find for' the defendants.” This instruction the court refused to give; and the question is, whether this refusal was error. This instruction directly propounded the question to the court, as to how far a party can be held bound by a sentence of condemnation in proceedings in which he was not permitted to appear *418 and m which he had no opportunity to be heard. The , , . J „ court was asked to give this instruction, m the tace ot the record introduced by Underwood himself, as a muniraent of his title, showing that he, as Judge of the District court of the United States, had ordered “the appearance, answer and claim” of McVeigh to be stricken from the files of his court; and theu, after refusing him a hearing, on the same day en' ers an order of condemnation and sale; and, at the sale, becomes the purchaser, (through his wife, upon whom he settles the property,) at a grossly inadequate price. It is upon this record, offered by himself as a muniment of title, showing these pregnant facts, that he asks the court to charge the jury, that by the decree of condemnation and sale which he had entered, without a hearing, and refusing an appearance, McVeigh had been “divested of all his right, title and interest in the premises, during his natural life; and that they must, therefore, find for the defendants.” The court did not err in refusing the instruction. It would, on the contrary, have been gross error to have given it. The sentence of condemnation and sale was a nullity—void in toto. It was rendered absolutely void by the act of the court in refusing to permit McVeigh to appear and be heard. The authorities on this point are overwhelming, and the decisions of all the tribunals of every country where an enlightened jurisprudence prevails, are all one way. It lies at the very foundation of justice, that every person who is to be affected by an adjudication should have the opportunity of being heard in defence, both in repelling the allegations of fact, and upon the matter of law; and no sentence of any court is entitled to the least respect in any other court, or elsewhere, when it has been pronounced ex parte and without opportunity of defence. An examination of both sides of the question, and deliberation *419 between the claims and allegations of the contending parties, have been deemed essentially necessary to the proper administration of justice by all nations, and in every stage of social existence. A tribunal which decides without hearing the defendant, or giving him an opportunity to be heard, cannot claim for its decrees the weight of a judicial sentence. See Smith’s Leading Cases, Vol. 1, part 2, ed 1872, p. 1118-19-20, and the numerous eases there cited; and to these might be added, cases almost without number. The principles which form the very foundation of the Common Law have been announced by the ablest and most distinguished jurists as maxims of natural justice and universal application; by Lord Brougham, when he said, in Earl of Bandon v. Becker, 8 Clarke, & Fin. R. 479, 510, “You may at all times, in a court of competent jurisdiction, competent as to the subject matter of the suit itself-—where 'you appear as an actor—object to a decree made in another court, upon which decree your adversary relies; and yon may, either as actor or defender, object to the validity of that decree; provided it was pronoun ced through fraud, contrivance or covin of any description, or not in a real suit; or if in a real and substantial suit, between parties who luere really not in contest with each other by Parke B., in Chapel v. Child, 2 Cr. & Jer. R, 558, when he declared that, “no judicial proceeding could deprive a man of any part of his property without giving him an opportunity of being heardby Judge Bronson, in Bloom v. Burdick, 1. Hill, H. Y. R. 130,—140, when he said, “ It is a cardinal principle in the administration of justice, that no man can be condemned or divested of his right until he has had the opportunity of being heard; and if judgment is rendered against him before that is done the proceeding will be as utterly void as though the court had undertaken to act *420 where the subject matter was not within its cognizance:” by Mr Justice Story, when he declared in his adrmrable work, “ Conflict of Laws,” that the common justice of all nations requires that no condemnation should be pronounced before the party had an opportunity to be heard:” by Chief Justice Marshall, when, in The Mary, 9 Cranch U. S. R. 126, 144, he announced the same principle, as “a maxim of natural justice and universal application:” and by Mr. Justice Swayne, when he said, in the veiy case we are now considering, that to deny the respondent a heaidng, would be “a blot upon our jurisprudence and civilization, and would be contrary to the first principles of the social compact and of the right adminstration of justice.”
And yet this plaintiff in error, holding a high judicial station under the Government of the United States, in violation of these great p3’inciples, known evei’y where as maxims of natural justice, not only denied the respondent' a hearing in his court, but, on the veiy day on which he committed that judicial act, which the Supreme court of the United States characterized in the strong language of Mr. Justice'Swayne, as “ a blot upon our jurisprudence and civilization,” he entered the order of condemnation and sale upon twenty days’ notice, and himself became the purchaser át a price so grossly inadequate as to shock the moral sense of every honest man. And now, when the owner, who has been thus deprived of his estate under the forms of law, by a judicial fraud, comes into a court of justice to assert his rights, in an action of ejectment against the man, who, acting as judge, denied him a hearing in his court, and entered a decree of condemnation and sale of his property, he is met by that very decree of condemnation and sale, entered by his adversary, in violation of every principle of law and natural justice; and the court is gravely *421 asked to instruct the jury, that the decree of condemnation and sale, thus obtained, “ has divested the plaintiff in ejectment of his legal title to the property in controversy, and that they must find for the.defendant.”
In other words, the court was asked to instruct the jury, that although the very record upon which the defendant, Underwood, relied as a muniment of his title conclusively showed, as it did show, that MeYeigh had been denied a hearing in his court, by ordering that his “appearance, answer and claim be stricken from the files,” of his court; which judicial act was declared by the Supreme court of the United States, “to-be contrary to the first principle of the social compact and the right administration of justice,” yet that the title of MeYeigh .was divested by this judicial fraud, and that he could not assei’t his rights in an action of ejectment.
The court properly refused this instruction. The decide of condemnation and sale entered under such circumstances, was not valid for any purpose. It was the merest nullity. In the language of judge Bronson, in Bloom v. Burdick, above cited, “ the proceedings were as utterly void as though the court 'had undei’taken to act when the subject matter was not within its cognizance.” The general principle is not at all affected by the allegation in the order denying a hearing, that MeYeigh was “a rebel living in the rebel lines.”
The Supreme court of the United States, by its unanimous opinion (11 Wall. 267, above cited) has put that-question forever at rest, when it says: “ It is alleged that he (MeYeigh) was in the position of an alien enemy, and hence could have no locus standi in that forum. If assailed there he could' defend there. The liability and the i’ight are -inseparable. A different result would be a blot on- our civilization and jurisprudence. We cannot hesitate or doubt on the subject. It would be contrary *422 principles of the social compact and of the right administration of justice.” ‘
We are, therefore, of opinion, that the said Corpora- » 1 tion court of Alexandria did not err in refusing the said fir.s* instruction asked for by the plaintiff in error. .
. We are now to consider the second assignment of error, wdiicb is, that the court refused to give the second instruction asked for by the plaintiff in error; which instruction is in these words: “That the said judgment and order in the said attachment suit, and the said sale and conveyance of the premises in the declaration mentioned, made by the sheriff', divested the plaintiff of the legal title to said premises; and that the jury m ust, therefore, find the issue joined for the defendants.”
The court refused to give this instruction, but gave the following: “ That the judgments and orders in the said attachment suits, and the sale and conveyance of the premises in the declaration mentioned, made under authority thereof, by the sheriff', divested the plaintiff of his legal title to said premises; and that the jury must, therefore, find for the defendants; unless they find that the said sale was fraudulently made, and the confirmation thereof was procured by fraud; and that the defendants or either of them were privy to such frauds, or had notice of the same, or of such circumstances as would put a prudent bona fide purchaser upon the enquiry in respect thereto.”
“ If the jury believe from the evidence, that the deendants, or either of them, combined with John 'E. Alley and others to purchase the property claimed in this suit, at the attachment sale, at a sacrifice; and if they shall further believe, that the said defendants, or either of them, in pursuance of such combination, so acted as to prevent competition at said sale, or to prevent the said property from realizing a fair value, then such combina *423 tion and action was fraudulent; and the jury must find for the plaintiff'.”
The granting of these two last instructions, and the refusal to grant the second instruction of defendant, in lieu of which these last were given, constitute the second, third and fourth assignments of error, which will be considered together, as they raise the same legal questions, involving the consideration of principles common to all.
It is undeniably true, as contended by the able counsel for the plaintiff in error, as a general proposition, that a sheriff’s deed conveying property which has been duly levied upon and fairly sold under a valid judgment rendered by a court of competentjurisdiction, passed the legal title to the purchaser. But it is equally true, that if the sale made by the sheriff was fraudulently made, and the order of confirmation of said sale was procured by fraud, and the purchaser was a party to that fraud, the deed of the sheriff shall avail nothing for or against the parties affected by it.
These two propositions are undeniably true; they are independent of each other, and stand well together.
The proposition that a sheriff’s deed for. property sold under a valid judgment of a court of competent jurisdiction, passes the legal title, is, as a matter of course, subject to the qualification that all the proceedings are regular and bona fide, and free from the taint of fraud. If fraud be shown, either in the proceedings or sale, or in the judgment confirming the sale, the whole proceedings are vitiated. The proceedings of a court of justice establishing rights, or fixing’ liabilities, must always be founded upon the fact that they are carried out bona fide, and without the taint of fraud. If fraud be shown the very fountain is poisoned, and all the proceedings are null and void. Courts of law and courts of equity have *424 concurrent jurisdiction to suppress and relieve against fraud. If a case of fraud be established, the courts will set aside all transactions founded upon it, by whatever machinery they have been effected, aud notwithstanding any contrivance by which it may have been attempted to protect them. It is immaterial whether such machinery and contrivance consisted in a decree in equity and a purchase under it, or of a judgment at law, or of other transactions between the actors in the fraud. Kerr on Fraud & Mistake, 44; 1 John’s Ch. 401; 5 How. R. (Miss.) 365; 1 New Hamp. R. 535; 1 P. Wms. R. 736; 12 Ves. R. 324; 7 Com. Bench N. S. 321; 32 Law Jour. Exch. 241.
A judgment or decree obtained by fraud upon .a court does not bind such court or any other; and its nullity on this ground, though it has not been reversed or set aside, may be alleged in a collateral proceeding. Kerr on Fraud & Mistake, 293; 11 How. 437; 5 Calif. R. 406; 63 Penn. R. 408; 62 Penn. R. 481; and other cases cited by Mr. Kerr. In Rex v. Duchess of Kingston, 20 How. St. T. 355, 544, (2 Smith’s L. C. 687,) He Grey C. J. said: “ Fraud is an extrinsic, collateral act, which vitiates the most solemn proceedings of courts of justice. Lord Coke says it avoids all judicial acts, ecclesiastical and temporal. In applying this rule, it matters not whether the judgment impugned has been pronounced by an inferior court, or by the highest court of judicature; but in all cases alike it is competent for every court, whether superior or inferior, to treat as a nullity any judgment which can be clearly shown to have been obtained by manifest fraud. Kerr on Fraud & Mistake, 294.
In the language of Lord Brougham, in Earl of Bandon v. Becher, before referred to (supra): “ It is not an irregularity, it is not an error, which is here complained *425 of, but it is tbat the whole proceeding (after the judgment) is collusive and fraudulent; tbat it cannot therefore be treated as a judicial proceeding, but may be passed by as availing nothing to the party who sets it up.”
‘•We are, therefore, of opinion that there was no error in the court below in refusing the instruction in the form in which it was presented, and in saying to the jury that the defendant in error, McVeigh, was divested of the legal title in the premises by the sale and deed of the sheriff; unless they should find “ that the said sale was fraudulently made, and the confirmation thereof was procured by fraud, and that the defendants, or either of them, were privy to such fraud,” &c.
The case of Lessee of Cooper v. Galbraith, 3 Wash. C. C. R. 546, is one exactly in point on this question. It was an action of ejectment, (as is the case before us,) and on the merits of the case it was contended that the lessee of the plaintiff was the presiding judge of the court in which the judgment was rendered; and it appeared in evidence that he purchased an interest in that j udgment, and was concerned with the nominal purchase of the land in controversy, under the execution ; that this conduct amounted to a breach of official duty; and,in short, that the whole transaction was tainted by such marks of fraud, imposition, and misconduct as .ought to invalidate the purchase.
The whole question of judicial misconduct and fraud, in acquiring title to the property, on which the action was founded, was submitted by Mr. Justice Washington to the j ury.
So, also, in the case of Martin v. Raulett, 5 Rich. Law R. 541, which was an action of trespass to try the title to real estate, in which one party claimed under a sheriff’s deed; the jury was instructed, among other things, *426 “ that all sales at auction should he open to full and free competition,” and that “ the purchaser must do no act the effect of which was to destroy fair competition.” Judge Withers, delivering the opinion of the court, said : “The jury, applying the standard presented to them, have affirmed that Gary’s conduct did contravene such rule of law and vitiate the sale by the sheriff' to himself. In this they have differed from the presiding judge. * * * Without undertaking to form any opinion ourselves, in the present ease, we must allow that when such a ques • tion does arise in a cause, there is no other arbitrament to which it can be submitted but that of the jury.” So we say in the case before us, that the question whether “ the sale was fraudulently made, and the confirmation thereof was procured by fraud,” was properly submitted by the court to the arbitrament of the jury, who in an action at law are the sole judges of the facts which constitute fraud. They have decided that question in the affirmative, and we cannot trench so far upon the province of the legal triers of fact as to reverse their decision, especially in a case where no motion is made for a new trial upon the ground that the verdict is contrary to the evidence.
The principles herein announced are not at all in contravention of the decisions of this court in Taylor v. King and Harris v. Harris, 6 Munf. 358, 367, so much relied on by the learned counsel for the plaintiff in error. Those cases simply affirm, “that a party or privy to a deed cannot avoid it, in a court of law, by parol evidence, on the ground of want of consideration, for he is estopped from averring such matter against a specialty.” Taylor v. King was a case in which both parties claimed under the same grantor, Charles Lewis, who conveyed the property in controversy to Edmundson, trustee, to secure certain creditors who assigned their debt to Taylor. After the *427 execution of the trust deed to Edmundson, and of course subject to that deed, Lewis sold the land to King, and put him in possession. There was a sale under the deed, and Taylor became the purchaser, and the deed was made from the trustee to Taylor. This of coui’se invested Taylor with the legal title. In an action of ejectment brought by Taylor v. King, who was in possession, this court held that King who purchased the land of Lewis after he had conveyed to Edmundson trustee, held it subject to the deed to Edmundson; and that claiming under the same grantor, he, King, was estopped from showing in a court of law, by parol, anything to impeach the deed of the grantor under whom he, as well as Taylor, claimed title
Kow it is insisted that in the case before us, the legal title to the land in controversy, which was in McVeigh, passed by the sheriff’s deed, under the sale in the attachment proceedings, just as the legal title in the case of Taylor v. King was passed by the deed of the trustee, and that McVeigh cannot, iii a court of law, impeach • that deed. It is true, as before observed, that a sheriff’s deed for property sold under a valid judgment, passes the legal title; but this proposition must always be subject to the qualification, that the proceedings are free from the taint of fraud. If the sale be fraudulent, or the judgment be obtained by fraud, then the deed of the sheriff conveys nothing, and is a mere nullity.
The distinction is plain between this case and that of a deed of trust. In the one case the grantor voluntarily parts with the legal title, when he conveys to a trustee. It is gone from him forever, and no party or privy to that deed can assail it; but is estopped in law from impeaching the legal title thus vested in the trustee. But when the legal title is transferred by judicial proceedings, those proceedings must be regular, and free *428 from fraud. If fraudulent they have no ojieration, and a deed under them, fraudulently made, or for property made at a fraudulent sale, conveys nothing, and will be treated in every court where this can be shown, as a nullity.
This is the plain result of all the authorities referred to.
We are therefore of opinion that there was no error in the instruction of the court below, which charged the jury that the sheriff’s deed under the attachment proceedings “divested McVeigh of the legal title, and that they must therefore find for the defendant; unless they should find that the said sale was fraudulently made, and the confirmation thereof was procured by fraud, &c.”
Kor did the court err in instructing the jmy that “ if the defendants combined with others to purchase the property at a sacrifice, and in pursuance of such combination so acted as to prevent competition at said sale, and to prevent the said property from realizing its fair value, then such combination was fraudulent; and the jury must find for the plaintiff.”
Whatever conflict of authority there may be as to how far a bona fide purchaser at a judicial sale will be protected against error in the proceedings, it is well settled, that when the purchaser combines with others to prevent competition, and thus gets the property at a sacrifice, he is not a bona, fide purchaser, and he cannot hold the property obtained by his own fraud. Kerr on Fraud 224, and cases there cited. In Cocks v. Izard, 7 Wall. U. S. R. 559, it is said: “The law does not tolerate any influence likely to prevent competition at judicial sales, and it accords to every debtor the chance for a fair sale and full price.
*429 In Slater v. Maxwell, 6 Wall. U. S. R. 268, the Su- . pretne court of the United States says: “It is essential to the validity of judicial sales, not merely that they should be conducted in conformity to the requirement of law, but that they should be conducted with entire fairness. Perfect freedom from all influence likely to prevent competition in the sale should be strictly exacted.”
It has been held in numerous cases, that a purchaser who used unfair means to prevent competition, cannot hold the property. Newman v. Meek, 1 Freeman’s Ch. R. 441; Johnston v. La Motte, 6 Rich., Eq. R. 347; Plaster v. Burger 5 Tnd. R. 232. See also Martin v. Raulett, 5 Rich. Law R. 541, and Dutcher v. Leake, 44 Illinois, R. 398. In the last named case it was held, “that when a purchaser at a judicial sale combines and confederates with the officer and others to conduct the sale as secretly as possible to prevent competition, and represents to the party interested in such sale, that it had been postponed, with intention to deceive such party, to the end that he shall not be present to compete for the purchase of such property at such sale, such party is not a bona fide purchaser, and will not be protected against errors in the proceedings.
And although mere inadequacy of consideration standing by itself, is not a sufficient reason for setting aside a judicial sale; yet if it exists in connection with other \ circumstances tending to impeach the fairness of the transaction and the good faith of the purchaser, it is entitled to great weight in determining the bona fide character of the purchaser, and to his protection as such.”
We are now to consider the last assignment of error, to wit: that the court erred in admitting the depositions offered by the defendant in error, McVeigh, the plaintiff in the court below. The bill of exceptions reserving this point states that “the plaintiff further to main *430 tain the issue, and in order to prove that said attachment and confiscation sales and the confirmation there- - of were procured by fraud, and that the defendant Underwood was a party to and had notice of said fraud, offered to read respectively the depositions of John G. Balderston, Francis Bane and John P. Robinson; to the reading of each of which the defendants objected, but which the court, overruling the defendants’ objections, allowed to be read; it having been stipulated between the parties, that no objection should be made to the reading of same on matters of form or notice; all matters of substance, however, being open to objection, the same as if made at the time of taking said depositions and as if they had been taken in this case.”
These depositions had been taken in -a proceeding against Oakes Ames, John P. Alley, and Samuel Hooper, who had purchased McVeigh’s property at the attachment sale, (Alley having transferred his purchase of the house and lot to Mrs. Underwood,) upon a rule awarded in the attachment suit of Francis Dane & Co., and other plaintiffs, v. C. A. Baldwin & Co., defendants, of whom McVeigh was one. After the action of ejectment was brought, in order, no doubt, to save the trouble and expense of retaking the same depositions, it was agreed to ivaive all objections as to matters of form and notice, and in effect regard the depositions as having been taken in the action of ejectment, upon due notice, but reserving the right to object to the reading of the depositions upon all matters of substance. And, accordingly, the bnly objection urged here against the reading of the depositions, is, that the evidence is irrelevant and immaterial, it being insisted that the legal effect of the sentence of condemnation, and the sale and conveyance by the sheriff, in the attachment suit, was to divest McVeigh of the legal *431 title; and even though the sentence of condemnation was a fraud upon McVeigh in denying him a hearing, and the sale was fraudulent, the legal title was transferred to the purchaser, and McVeigh could not maintain his action in ejectment.
The motion to exclude the depositions, therefore, raises, and was intended to raise, precisely the same legal questions-which have been already disposed of in noticing the 2d, 3d and 4th assignments of error. It is uot necessary, therefore, to repeat the views and citations of authorities already referred to, which show that when McVeigh was met in his action of ejectment by the production of the records in the confiscation and attachment suits, and the defendants relied upon the deeds of the marshal and the sheriff, it was competent for McVeigh to show by evidence, as well as by the face of the proceedings, that they were fraudulent and void, and that deeds made under them conferred no title.
For this purpose, the evidence which the plaintiff in error in his petition insists was immaterial and irrelevant, was most material and very relevant. It certainly strongly tended to show, and did, in the opinion of the jury, as their verdict proves, conclusively show, that there was formed between the plaintiff in eraor, John B. Alley, Oakes Ames and others, (the last two named being membei's of Congress from the State of Massachusetts,) a corrupt and fraudulent combination to prevent competition, and to secure to themselves the whole real estate of McVeigh at the lowest possible price, and one grossly inadequate to its real value. We’extract from-these depositions, (which are quite voluminous and gives with much detail, a complete history of these transactions,) only enough to show the relevancy and materiality of the evidence offered. John O. Balderston, of Baltimore, testified as follows: “As a member of the *432 firm of Balderston, Ward & Co., and as agent for Francis Dane & Co., Kimball, Robinson & Co., the last two being Boston firms, also, as agent for the Asiatic Bank of Salem, Mass., I had certain notes and claims against C. A. Baldwin & Co., of Alexandria, of which firm Mr. McVeigh was a partner. I went 'with these claims to Alexandria—learned that Mr. McVeigh -was in Richmond, or somewhere in Virginia beyond our lines. This was at sometime in the spring or summer of 1863. I placed the matter in the hands of Mr. Beach, an attorney at law7, who afterwards instituted suit upon them against Baldwin & Co. He. advised us, subsequently, that he had obtained judgments thereupon, and that attachments had been issued against the property of McVeigh, or a portion of it. Hothing further was done about them, until I learned that the property had been seized by the United States marshal, under the confiscation act, and wras advertised to be sold thereunder. Upon hearing that fact, I started for Washington, and endeavored to obtain a postponement of the sale. I called upon Mr. Alley in relation to it, in the months of January and February, A.D. 1872. Mr. Alley promised any assistance he could give in furthering our object.”
“I then went to Alexandria, saw Mr. Beach, who advised that the confiscation act could not apply in the case; that the decree of confiscation made by Judge Undeiwrood, wras against the fee simple of the estate, and could not be sustained. After the lapse of a few months, having learned that I could not obtain a postponement of the sale, I communicated with the parties interested, upon which Mr. Bane and Mr. Robinson came to Washington, arriving there on the morning of April 9th, 1864. The next day we had an interview with Judge Underwood, in company with Mr. Beach. The Judge refused to postpone the sale, but intimated that We might *433 make an arrangement about our claims. He said lie wanted to buy a dwelling house for his wife, and if he became the purchaser at the sale, he for one would be willing to pay fifty per cent, of his proportion of our judgments. He informed us that Mr. L. E. Chittenden, who was interested in a steamship company, would be likely to purchase the wharf property, but would not bid on the dwelling houses; and advised us to see Mr. Chittenden.”
“ In the afternoon of the same day, after the above named interview, we met Mr. Alley on Pennsylvania Avenue. Mr. Robinson informed him (Mr. Alley) that the sale ivas to take place the next day. Mr. Alley advised us to buy the property if it was not sold too high, with a view to secure our claims under the judgments and attachments. That evening Robinson and myself went to Mr. Chittenden’s house—-informed him that Judge Underwood had intimated that he (Mr. Chittenden) might perhaps buy the wharf property. Mr Chittenden said he might buy it, provided that he could get it at a price which he would consider equivalent to a fair rent for a few years; that he had no confidence in the title to be derived under the confiscation sale. That it would be well for us to see Mr. Thomas Clyde, who would arrive in "Washington hi the morning, and was largely interested in the steamship corporation.”
“ It was suggested to Mr. Chittenden that there would be no time in the morning to see and talk with Mr. Clyde, as the sale was advertised to take place at 10 o’clock; upon which he said he would write Judge Underwood, asking him to postpone the sale until he could get there. He accordingly sat down and wrote a note, and gave it to Mr. Robinson, addressed to Judge Underwood.”
*434 “ÍN ext morning all the parties met at Alexandria courthouse, Mr. Alley and Mr. Oakes Ames being on board the boat on which I met with Mr. Clyde. Mr. Chittenden arrived there after us. Messrs. Dane and Eobiuson and myself had an interview with Mr. Chittenden and Mr. Clyde in the courthouse, the sale having been postponed. At this interview Mr. Clyde refused to purchase under the sale, or to buy our judgments, or, as he expressed it, to have any thing to do with it. The sale took place at 12 o’clock, (noon.) The property was in seventeen different lots. The attachments in our favor were issued only against seven or eight of them, and as these were separately offered for sale I gave notice to the bystanders of the attachments against them held by us.”
“ The sale occurred on Monday the 11th day of April, 1864. The deputy marshal who conducted the sale denied the validity of our claims against the property as against proceedings under the confiscation act. A portion of the property covered by our attachments was purchased by a Mr. Eldridge. After the sale we all returned to Washington. I did not see Mr. Ames or Mr. Alley at the sale. I learned at Washington that Mr. Eldridge had purchased the property for Mr. Ames, and I was afterwards told by Mr. Alley that he was interested in the purchase with Mr. Ames. This was on the evening of the day of sale, in the lobby of the House of Eepresentatives. The next morniüg, Eobinson, Dane and myself had an interview with Mr. Ames and Mr. Alley at the Washington House, in Washington. Mr. Alley proposed we should go in jointly with them in the purchase, we putting in our judgment claims in the joint concern; that he, Mr. Alley, could rent the property to the government, and thereby we should be able to realize our interest.”
*435 “We acceded to this proposition at the suggestion of Mr. Alley and Mr. Ames, they becoming security in accordance with the laws of Virginia. The property was advertised to be sold by the sheriff under our judgments. We all then returned home.”
“Early in May I went again to Washington. I was there joined by Dane, Robinson and L. B. Harrington, then President of the Asiatic Bank. We then sold our judgments to Mr. Alley for the full amounts, less seven hundred dollars—that being the estimated proportion of a prior attachment resting upon the property. On the morning of May 10th. 1864, the day on which this sale under our attachménts was advertised to take place, in Mr. Beach’s office in Alexandria, we executed the assignments of our judgments to John B. Alley, Oakes Ames, Samuel Hooper and William A. Duncan. The sale was advertised (according to the best of my knowledge and belief) to take place at 12 o’clock, but did not in fact take place until about 2 o’clock, P. M., though I had heard of no announcement made of a postponement.
“After the necessary papers were all prepared we went from the office of Mr. Beach to the market-house, where the sale was to take place, and was made. Prior to the sale Mr. Alley insisted that we should not bid against him. I only recollect the following named peri sons being present at the sale, viz: Mr. Robinson, Mr. Harrington and myself, Mr. Beach, (our att’y,) Mr. Alley, Mr. Duncan, Walter Penn, (auctioneer at the previous sale,) the sheriff', and two or three others, whom I did not know. The property was mostly bid in by Mr. Alley. I made some bids at his suggestion, and he would bid over me. I think Mr. Duncan made one or two bids. Mr. Alley managed the bidding.”
*436 “In the settlement of our sale to Mr. Alley and others we received Mr. Ames’ note for four thousand dollars, at sixty days, Mr. Alley’s draft ou his house in Boston for the balance of the sum due, less Mr. Duncan’s payment to him of fifteen hundred and fifteen dollars, which he, Mr. Alley, paid over to us. I overheard Mr. Alley and Mr. Duncan agree to proportionately share the risk of a note to be given by Judge Underwood for his proportion of the purchase. In conversation with Mr. Alley, at which he insisted, as I have before expressed, that we should not bid against him, his language was, ‘we having purchased your judgments, you are not (or will not) bid against us.’ This is as nearly as I can recollect it.”
In answer to the eighth question by the counsel for C. A. Baldwin & Co., “At the attachment sales who bid in the said dwelling house last mentioned, and at-what price ?” he said £ John B. Alley, at about thirteen hundred dollars; but I have since seen a certified copy of a deed from the sheriff of Alexandria county to Maria G. Underwood. ”
In answer to the sixteenth question by same, “ You have stated, in answer to the 3d question above, that the said attachment sales were advertised to take place at 12 o’clock M., but in fact did not take place until 2 o’clock, P. M., on the day of sale, and that you heard no announcement made of a postponement; why was the postponement made ?” He said, “It- was made to enable Mr. Beach to prepare the papers by which we assigned our judgment claims to John B. Alley, Oakes Ames, Duncan, &c.; and after the papers were prepared we went to the market-house, and the sales were made.”
In answer to the seventeenth question by same:
“Was any bell rung, or any public announcement made that the sale was then to take place, so as to give *437 persons who might wish to make bona fide bids an opportunity to purchase the property?” He said, “There was no hell rung to attract a crowd. The auctioneer merely stated to those who accompanied him from Mr. Beach’s office, that the sale would then take place. Ho effort was made to gather a crowd of bidders.”
In answer to the eighteenth question by same :
“Was there or notin fact anything more than a mere form of sale ?” He answered. “ There toas hardly even a form of sale.”
In answer to the twentieth question by the same, “Were or not the persons interested in the attachment sales the same persons interested in the confiscation sales?” He replied, “ They were all the same ring.”
In answer to the question, “ What price did said house (meaning the house in controversy) bring at said attachment sale, and what was its real value ?” He said, “ It sold for seven hundred dollars, and I should think it was worth from ten to twelve thousand dollars.”
Francis Dane, of Boston, testified as follows: “Our firm had a claim in 1861 for some forty-five hundred dollars against the firm of O. A. Baldwin & Co. of Alexandria, in Virginia, of which firm Mr. McVeigh was a partner. In 1862 we sent the claim to Mr. Balderston, at Baltimore, who had a claim against Baldwin & Co., with a request that if he concluded to institute suit against them on his own claim, to also cause the same to be done with ours. Our claim was accordingly put in suit, and judgment was obtained in our favor in January 1864, at the court in Alexandria. In the spring of 1864 we were informed by Mr. Beach, our attorney, that Judge Hnderwood had confiscated, by a decree in his court, and had caused to be advertised for sale under the confiscation act, the property which we had attached, and also other property in Alexandria belonging to Mr. *438 McVeigh. The sale was to take place at public auction, on the 11th of April 1864. Mr. Robinson, of the firm ' of Kimball, Robinson & Co., of Boston, proceeded to Washington with me, and we arrived there on the 9th, where we met Mr. Balderston, who was waiting for us. We proceeded to Alexandria, (Mr. Robinson, Balderston and I,) and had an interview with Mr. Beach, our attorney. He wished us to go with him to Judge Underwood, to try and get the sale of the property postponed, on which our attachment lay. The judge being absent at Washington, Mr. Beach asked us to come down the next morning and meet him together, advising us if we could not get the sale postponed, not to buy in the qiroperty, unless we could get it for a sum equivalent to the rents of same while the war should last; that is to say, for a nominal sum, as he called it; that he could not have any question that the decision of the court upon the confiscation act could not be sustained. He had the interview with the judge, all of us together, on the following day—urged the Judge to make the postponement, which he declined to do. The judge told us this was the first case in which property had been confiscated in fee simple, and that Mr. Whiting, solicitor of the War Department, had complimented him on that decision.”
He further testified: “We, next day being the 10th of May, on which the property was advertised to be sold at 12 o’clock, proceeded to Alexandria; there met Mr. Alley and Mr. Ames, and transferred the judgments, with all the right, title and interest on the claim on which the judgments were founded, to John B. Alley, Oakes Ames, Samuel Hooper and William A. Duncan. Mr. Duncan informed me that a previous arrangement had been made between Mr. Alley and the parties who purchased at the confiscation sale, to pay their proportional share of the judgments in our favor, and by that *439 means they would have a double title; so that if one should fail, they would be able to hold on to the other. In Mr. Ames’ words he wanted these judgments to plaster over the property. We attended the sale, which took place two hours later than the time advertised: were some ten or twelve persons present, including Mr. Alley, Mr. Beach, Mr. Robinson, Mr. Balderston, the sheriff, his clerk, and myself. The property was sold, and bid off by Mr. Alley in different parcels, each house being sold separately. There were some bids made at his request, but as far as I heard the last bid on each piece of property was made by Mr. Alley, after he had requested others to bid. Previously to attending the sale, Mr. Alley insisted upon our not bidding on the property, as he had bought our claims. A copy of the assignment or transfer of the judgments above referred to is hereto annexed, marked A.”
In answer to the sixth question by the counsel for C. A. Baldwin & Co., “Why then did you sell your judgments to Alley, Ames and others after the confiscation sales?” He said “because we were assured by Judge Underwood and by Alley and Ames, then members of CoDgress from Massachusetts, the confiscation sales were valid and binding, and that our attachments were of no value; that the confiscation would be sustained by the court; and we thought, under the circumstances, that it was necessary for us to save ourselves by accepting their offer to buy our judgments, which was a small amount in comparison to the value of the property. The parties above mentioned, said that if they failed on the confiscation title they would fall back on the attachment title, and they were willing to pay us something for our judgment and liens; and they paid us in full, except $700.
*440 Mr. J ohn P. Eobinson of Boston testified as follows : “In 1861, and for sometime before and after, I was a member of the firm of Kimball, Eobinson & Co., and in 1861 we had certain claims against O. A. Baldwin & Co., of Alexandria, of which Mr. McVeigh was a partner. These claims being unpaid at maturity, we placed them in the hands of S. Ferguson Beach, an attorney at law of Alexandria, for collection. Mr. John C. Balderston, of the firm of Balderston, Ward & Co., of Baltimore, having claims of their own against Baldwin & Co., acted for us in placing them in Mr. Beach’s hands. Mr. Beach commenced a suit against Baldwin & Co., attaching certain real estate belonging to Mr. McVeigh, upon which suit he obtained a judgment at the January term in 1864, for over $3,000. As we could uot sell that property without first giving bonds of some party who held real estate in the State of Virginia, we did not take any measures to sell or effect a sale, or give any special attention to it, until we were informed that the United States government had seized the property under the confiscation act, and had advertised it for sale. We then took measures, by correspondence and otherwise, to obtain a postponement of the sale by the government, believing that as we were loyal creditors we should be entitled to the avails of the property on our judgment rather than the government. Our claims were contracted before the war. Being unable to effect a postponement, and learning that the property would be sold under the confiscation act on the 11th day of April, 1864,1 went to Washington in company with Mr. Francis Dane, of Boston, arriving there on the 9th of April, and met Mr. Balderston in Washington. We, Dane, Balderston and myself proceeded to Alexandria, had an interview with Judge Underwood, of the U. S. District court, by whose decree the property was con *441 fiscated. We urged Mm to postpone the sale; wMcli lie declined to do. He said, however, if the property should be sold under the decree of confiscation, he would like to buy, or have Ms wife to buy, he having no money of his own to purchase with, as he said, one óf the houses which our attachment covered, for his own use. He said he thought the parties buying under the confiscation act would pay us something for our judgments, to obtain a more perfect title, and make it sure if the confiscation act should be set aside. He knew the amount of our judgments, and said that in his own case, and also others who might purchase, he would advise to pay us fifty per cent, of the amount of our claims, adding, “ perhaps we might get more than that out of the parties who might purchase, if the property did not sell very high.” He further testified, “When we were in Alexandria we took measures to have the property advertised for sale under our judgments, which sale was advertised to take place on the 10th of May 1864. Before that time arrived we were informed that Mr. Alley and Mr. Ames declined to carry out the memorandum agreement referred to above. After receiving that information, Mr. Dane, Mr. L. B. Harrington, president of the Asiatic Bank, at Salem, and myself, went to Washington to be present at the sale. We arrived there a few days before the 10th of May, 1864, and found that Mr. Ames and Mr. Alley abandoned the agreement, stating that the memorandum they had given us would not stand in law; and although Mr. Alley wrote it, Mr. Ames said Mr. Alley found fault with him for having signed it. The day before the sale was to take place Mr. Dane, Harrington, Balderston and myself made a bargain with Mr. Alley, by which Mr. Alley was to purchase for himself and others all our judgments at seven hundred dollars less than their whole amount. We were told *442 that the parties who bought the property under the confiscation sale were ratably interested in the judgments, with Mr. Alley. On the morning of the sale we went to Alexandria, and the papers were made, assigning our interest to John B. Alley, Oakes Ames, Samuel Hooper and W. A. Duncan, according to the agreement made the previous day with Mr. Alley; thereupon Mr. Alley and Mr. Ames executed the bonds which the law required to be given, and we received in notes, checks, and money the amount agreed upon with Mr. Alley. Some two hours or more were occupied in executing the papers, beyond the time when the sale was to take place. Mr. Ames returned to Washington before the sale. I went down to the place of sale with Mr. Dane, Balderston, Harrington, Mr. Alley and Mr. Beach, and some half a dozen others.
The property was sold by the sheriff under the direction of Mr. Alley chiefly, and I think he was the principal purchaser. Mr. Alley told us as he was to purchase our judgments we must not bid against him. There was apparently no competition among those present for the purchase of the property. As we were going from Mr. Beach’s office to the place of sale, Mr. Alley told me they might wish to have some piece of the property struck off to me. When one of the parcels was struck off, in reply to the inquiry of the auctioneer, ‘Who was the purchaser,’ Mr. Alley gave my name. I assented to it, but made no bid, and had nothing further to do with it.”
We have made these extracts from the depositions to show that the evidence was relevant and material to the issue, and that the court below did not err in refusing to exclude them from the jury. Ho evidence whatever was offerredto contradict or explain this testimony; and upon this unimpeached and unimpeachable téstimony *443 the iury found their verdict. There was no motion to set aside the verdict as contrary to the evidence ; and it there had been, this court, upon the record before us, would have been compelled to have sustained the verdiet. The whole question of fraud was properly submitted to the jury. Their verdict is conclusive in the case, especially as no effort is made by the plaintiff in error, to contradict or explain the overwhelming and 'unimpeached evidence; and the court was not even asked to set aside the verdict of the jury as contrary to the evidence.
Upon the whole, we are of opinion that the judgment of the Corporation court of the City of Alexandria should be affirmed.
Judgment aeeirmed.